Sherrie Lynn ZUKLE, Plaintiff–
Appellant,

v.

The REGENTS OF THE UNIVERSITY
OF CALIFORNIA, Defendant–
Appellee.

No. 97–16708.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1998.

Decided Feb. 23, 1999.

Dan Siegel, Hunter Pyle, Siegel & Yee, Oakland, California, for the plaintiff-appellant.

Charity Kenyon, Diepenbrock, Wulff, Plant & Hannegan, Sacramento, California, for the defendant-appellee.

Before: ALARCON, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether a medical school violated the Americans with Disabilities Act or the Rehabilitation Act when it dismissed a learning disabled student for failure to meet the school's academic standards.

I

Sherrie Lynn Zukle entered the University of California, Davis School of Medicine ("Medical School") in the fall of 1991 for a four year course of study. The first two years comprise the "basic science" or "pre-clinical" curriculum, consisting of courses in the function, design and processes of the human body. The final two years comprise the "clinical curriculum." In the third year, students take six consecutive eight-week clinical clerkships. During the fourth year, students complete clerkships of varying lengths in more advanced areas. Most clerkships involve treating patients in hospitals or clinics, and oral and written exams.

From the beginning, Zukle experienced academic difficulty. During her first quarter, she received "Y" grades in Anatomy and Biochemistry.[1] Upon reexamination, her Biochemistry grade was converted to a "D." She did not convert her Anatomy grade at that time. In her second quarter, she received a "Y" grade in Human Physiology, which she converted to a "D" upon reexamination.

In April 1992, the Medical School referred Zukle to the Student Evaluation Committee ("SEC").[2] Although subject to dismissal

---

1. The Medical School assigns letter grades of A, B, C, D, F, I and Y to measure academic performance. A "Y" grade in a pre-clinical course is provisional; it means that a student has earned a failing grade but will be or has been permitted to retake the exam. However, a "Y" grade in a clinical clerkship indicates unsatisfactory performance in a major portion of that clerkship and may not be converted until the student repeats that portion of the clerkship.

2. The Medical School's Committee on Student Evaluation and Promotion, which consists of two Promotions Boards and the SEC, monitors the progress of students with academic difficulties. Promotions Board A reviews preclinical students (i.e. students in the first two years of study); Promotions Board B reviews clinical students (i.e. students in the last two years of study). Generally, the SEC meets with students and their advisors before making a recommendation to the appropriate Promotions Board. The Promotions Board then conducts an independent review of

pursuant to the Medical School's bylaws,[3] Zukle was allowed to remain in school. The SEC (1) placed Zukle on academic probation,[4] (2) required her to retake Anatomy and Biochemistry, (3) required her to be tested for a learning disability, and (4) placed her on a "split curriculum," meaning that she was given three years to complete the pre-clinical program, instead of the usual two years. Zukle continued to experience academic difficulty. For the spring quarter of 1992 (while on academic probation) she received a "Y" grade in Neurobiology. In the fall, she received a "Y" grade in Medical Microbiology and in the winter she received a "Y" in Principles of Pharmacology. In total, Zukle received eight "Y" grades during the pre-clinical portion of her studies. Five were converted to "C" after reexamination, two to "D" and one to "F."

In November 1992, Zukle was tested for a learning disability. The results received in January 1993, revealed that Zukle suffered from a reading disability which "affects visual processing as it relates to reading comprehension and rate when under timed constraints." In short, it takes Zukle longer to read and to absorb information than the average person.[5] Zukle asked Christine O'Dell, Coordinator of the University's Learning Disability Resource Center, to inform the Medical School of her test results in mid-July 1993. O'Dell informed Gail Currie of the Office of Student Affairs in a letter dated July 21, 1993. O'Dell recommended that the Medical School make various accommodations for Zukle's disability and recommended various techniques for Zukle to try to increase her reading comprehension. The Medical School offered all of these accommodations to Zukle.

After completing the pre-clinical portion of Medical School, Zukle took the United States Medical Licensing Exam, Part I ("USMLE") in June 1994. Shortly thereafter, she began her first clinical clerkship, OB–GYN. During this clerkship, Zukle learned that she had failed the USLME.[6] The Medical School allowed Zukle to interrupt her OB–GYN clerkship to take a six-week review course to prepare to retake the USMLE, for which the Medical School paid.

Before leaving school to take the USMLE review course offered in southern California, Zukle asked Donal A. Walsh, the Associate Dean of Curricular Affairs, if she could rearrange her clerkship schedule. At this point, Zukle had completed the first half of her OB–GYN clerkship. She asked Dean Walsh if, instead of completing the second half of her OB–GYN clerkship upon return from retaking the USMLE, she could start the first half of a Family Practice Clerkship, and then repeat the OB–GYN clerkship in its entirety at a later date. Zukle testified that she made this request because she was concerned about how far behind she would be when she returned from the USMLE review course. She further asserted that she thought that if she started the Family Practice clerkship (which apparently requires less reading than the OB–GYN clerkship), she would be able to read for her upcoming Medicine clerkship at night. Zukle testified that Dean Walsh, and several other faculty members, including the Instructor of Record for Family Practice and the Instructor of Record for OB–GYN, initially approved her request. Later, however, Dean Walsh denied Zukle's request and informed her that she had to complete the OB–GYN clerkship before beginning another clerkship.

the student's performance and decides whether to accept or reject the SEC's recommendation.

3. The Medical School's bylaws provide that a student is subject to dismissal if she receives two or more failing grades within one academic quarter. Zukle received two "Y" grades in her first quarter.

4. The Medical School's bylaws provide that a student on academic probation is required to remedy her deficient grades, and is subject to

dismissal for failure to do so or if she receives another deficient grade while on academic probation.

5. Under timed conditions, Zukle's reading comprehension is in the 2nd percentile, whereas when untimed her comprehension is in the 83rd percentile.

6. Zukle's score placed her in the 5th percentile nationally.

In September 1994, Zukle took and passed the USMLE on her second attempt.[7] She returned to the Medical School and finished her OB–GYN clerkship. Without requesting any accommodations, she began her Medicine clerkship. During this clerkship, she learned that she had earned a "Y" grade in her OB–GYN clerkship. Because of this grade, Zukle was automatically placed back on academic probation.[8]

Two weeks before the Medicine written exam, Zukle contacted her advisor, Dr. Joseph Silva, and expressed concern that she had not completed the required reading. Dr. Silva offered to speak with Dr. Ruth Lawrence, the Medicine Instructor of Record, on Zukle's behalf. According to Zukle, she then spoke with Dr. Lawrence in person and requested time off from the clerkship to prepare for the exam. Dr. Lawrence denied Zukle's request. Zukle passed the written exam, but failed the Medicine clerkship because of unsatisfactory clinical performance. On Zukle's grade sheet, Dr. Lawrence rated Zukle as unsatisfactory in clinical problem solving skills; data acquisition, organization and recording; and skill/ability at oral presentations. Dr. Lawrence also reported negative comments from the people who worked with Zukle during the clerkship. Because Zukle had earned a failing grade while on academic probation, she was again subject to dismissal pursuant to the Medical School's bylaws.

On January 13, 1995, Zukle appeared before the SEC. The SEC recommended that Zukle (1) drop her current clerkship, Pediatrics; (2) start reviewing for the OB–GYN exam, and retake it; (3) repeat the Medicine clerkship in its entirety; (4) obtain the approval of the SEC before enrolling in any more clerkships; and (5) remain on academic

probation for the rest of her medical school career.

On January 17, 1995, the Promotions Board met to consider Zukle's case. The Promotions Board voted to dismiss Zukle from the Medical School for "failure to meet the academic standards of the School of Medicine." According to Dr. Lewis, who was a member of the Promotions Board and was present when it reached its decision, "the Promotions Board considered Plaintiff's academic performance throughout her tenure at the medical school and determined that it demonstrated an incapacity to develop or use the skills and knowledge required to competently practice medicine."

In June 1995, Zukle appealed her dismissal to an *ad hoc* Board on Student Dismissal composed of faculty and students ("the Board").[9] Zukle appeared before the Board on November 12, 1995, and requested that her dismissal be reconsidered and that she be given extra time to prepare prior to some of her clerkships to accommodate her disability. The Board also heard testimony from Dr. Silva, who spoke favorably on her behalf, Dr. Ernest Lewis, Associate Dean of Student Affairs and Dr. George Jordan, the Chair of the Promotions Board at the time of Zukle's dismissal. When asked about Zukle's request to remain in Medical School on a decelerated schedule, Dean Lewis testified:

> There is a certain point when everyone has to be able to respond in the same time frame. A physician does not have extra time when in the ER, for example. Speed of appropriate reaction to crisis is essential.

The Board on Student Dismissal voted unanimously to uphold the Promotions Board's decision of dismissal.

7. Zukle's score placed her in the 9th percentile nationally.

8. The Promotions Board had voted to remove Zukle from academic probation in October 1994. At that time, it was unaware of her OB–GYN clerkship grade. The Medical School's bylaws provide that a student who receives a "Y" grade in her third or fourth years is automatically placed on academic probation at the time of receipt of the grade.

9. The Medical School's bylaws provide that any student who has been dismissed from the Medical School may appeal her dismissal to the Dean, who in turn may appoint an *ad hoc* board consisting of five faculty members and two students to review the appeal. The Dean is responsible for the final disposition of the appeal.

On January 22, 1996, Zukle filed a complaint in federal district court for damages and injunctive relief against the Regents of the University of California ("Regents"). The complaint alleged discrimination based on disability, sex and race, and sexual harassment. On June 6, 1997, the Regents filed a motion for summary judgment. The district court entered its Memorandum of Opinion and Order on August 7, 1997, granting summary judgment to The Regents on all of Zukle's claims. The court found that Zukle's "race, sex, and sexual harassment claims are unsupported by the record and do not merit discussion." On Zukle's Americans with Disabilities Act ("ADA") and Rehabilitation Act claims, the district court found that "[b]ecause the evidence before the court shows that Zukle could not meet the minimum standards of the UCD School of Medicine with reasonable accommodation, she is not an otherwise qualified individual with a disability under the Rehabilitation Act or the ADA."

■ Zukle timely appeals from the district court's grant of summary judgment on her ADA and Rehabilitation Act claims.[10]

## II

Zukle claims that she was dismissed from the Medical School in violation of Title II of the ADA and section 504 of the Rehabilitation Act. Title II of the ADA provides, in relevant part:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Title II prohibits discrimination by state and local agencies, which includes publicly funded institutions of higher education. *See id.* at § 12131(1)(B).

Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, which provides:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794.

To make out a prima facie case under either the ADA or Rehabilitation Act Zukle must show that (1) she is disabled under the Act; (2) she is "otherwise qualified" to remain a student at the Medical School, i.e., she can meet the essential eligibility requirements of the school, with or without reasonable accommodation; (3) she was dismissed solely because of her disability; and (4) the Medical School receives federal financial assistance (for the Rehabilitation Act claim), or is a public entity (for the ADA claim). *See Dempsey v. Ladd,* 840 F.2d 638, 640 (9th Cir.1988); *cf. Willis v. Pacific Maritime Assoc.,* 162 F.3d 561, 565 (9th Cir.1998) (stating prima facie elements for ADA employment case).[11]

---

10. Zukle did not raise her race, sex or sexual harassment claims in her opening brief; therefore she has waived any appeal from the district court's grant of summary judgment on these claims. *See Sanchez v. Pacific Powder Co.,* 147 F.3d 1097, 1100 (9th Cir.1998) ("Ordinarily, a party's failure to raise an issue in the opening brief constitutes a waiver of that issue.").

11. There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act. *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights [applicable to ADA claims]."); *Bragdon v. Abbott,* 524 U.S. 624, ——, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998) (stating that courts are required to "construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act"). Thus, courts have applied the same analysis to claims brought under both statutes, *see Doe v. Univ. of Maryland Med. Sys. Corp.,* 50 F.3d 1261, 1265 n. 9 (4th Cir.1995) ("Because the language of the two statutes is substantially the same, we apply the same analysis to both."), and courts routinely look to Rehabilitation Act case law to interpret the rights and obligations created by the ADA, *see, e.g., Collings v. Longview Fibre Co.,* 63 F.3d 828, 832 n. 3 (9th Cir.1995) ("The legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA."); *Theriault v. Flynn,* 162 F.3d 46, 48 n. 3 (1st. Cir.1998) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision."); *cf. Weinreich v. Los Angeles*

The Regents do not dispute that Zukle is disabled and that the Medical School receives federal financial assistance and is a public entity. The Regents argue, however, that Zukle was not "otherwise qualified" to remain at the Medical School. Zukle responds that she *was* "otherwise qualified" with the aid of reasonable accommodations and that the Medical School failed reasonably to accommodate her.[12]

### A

The ADA defines a "qualified individual with a disability" as one who "meets the essential eligibility requirements ... for participation in [a given] program[ ] provided by a public entity" *"with or without reasonable modifications* to rules, policies, or practices...." 42 U.S.C. § 12131(2) (emphasis added); *accord Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (holding that under the Rehabilitation Act, an otherwise qualified individual is "one who is able to meet all of a program's requirements in spite of his handicap"). In the school context, the implementing regulations of the Rehabilitation Act define an otherwise qualified individual as an individual who, although disabled, "meets the academic and technical standards requisite to admission or participation in the [school's] education program or activity." 34 C.F.R. § 104.3(k)(3).

However, under Rehabilitation Act regulations, educational institutions are required to provide a disabled student with reasonable accommodations to ensure that the institution's requirements do not discriminate on the basis of the student's disability. *See* 34 C.F.R. § 104.44(a). Similarly, the ADA's implementing regulations require a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity." 28 C.F.R. § 35.130(b)(7). The Supreme Court has made clear that an educational institution is not required to make fundamental or substantial modifications to its program or standards; it need only make reasonable ones. *See Alexander v. Choate,* 469 U.S. 287, 300, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

### B

■ In order to evaluate Zukle's claim, we must clarify the burdens of production and persuasion in cases of this type. The district court correctly noted that we have not previously addressed the allocation of the burdens of production and persuasion for the "otherwise qualified"—"reasonable accommodation" prong for a prima facie case in the school context. We have, however, recently articulated the allocation of these burdens in the employment context. *See Barnett v. U.S. Air, Inc.,* 157 F.3d 744 (9th Cir.1998). In *Barnett,* we made clear that the plaintiff bears the ultimate burden of persuasion with regard to whether he is qualified, i.e., in the school context, that he is able to meet the educational institution's essential eligibility requirements with or without the aid of reasonable accommodations. *See id.* at 749 (noting that, in the employment context, the plaintiff bears the burden of proving that he can perform the essential functions of the job with or without reasonable accommodation).

We further held that when the plaintiff alleges a failure to accommodate, part of the plaintiff's initial burden includes "showing the existence of a reasonable accommodation." *Id.* at 749. In the employment con-

---

*County Metro. Transp. Auth.,* 114 F.3d 976, 978 (9th Cir.1997) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act...." (citations omitted)).

**12.** Zukle does not argue that she could meet the Medical School's essential eligibility requirements *without* the aid of reasonable accommodations. Indeed, Zukle could not make this argument. As discussed below, Zukle had failed to meet the Medical School's essential eligibility requirements at the time she was dismissed. Because she had received a failing grade while on academic probation, she was subject to dismissal pursuant to the Medical School's bylaws. Accordingly, Zukle must show that she can meet the academic standards of the Medical School *with* the aid of reasonable accommodations. *See Barnett v. U.S. Air, Inc.,* 157 F.3d 744, 748 n. 2 (9th Cir.1998).

text, "[o]nce the plaintiff has established the existence of a reasonable accommodation that would enable him or her to perform the essential functions of an available job, the burden switches to the defendant to show that this accommodation would constitute an undue hardship." *Id.*

Adopting a similar burden shifting framework in the school context, we hold that the plaintiff-student bears the initial burden of producing evidence that she is otherwise qualified. This burden includes the burden of producing evidence of the existence of a reasonable accommodation that would enable her to meet the educational institution's essential eligibility requirements. The burden then shifts to the educational institution to produce evidence that the requested accommodation would require a fundamental or substantial modification of its program or standards. The school may also meet its burden by producing evidence that the requested accommodations, regardless of whether they are reasonable, would not enable the student to meet its academic standards. However, the plaintiff-student retains the ultimate burden of persuading the court that she is otherwise qualified.

### C

■ Before turning to the merits of Zukle's claims, we must decide whether we should accord deference to academic decisions made by the school in the context of an ADA or Rehabilitation Act claim, an issue of first impression in this circuit.

In *Regents of the Univ. of Michigan v. Ewing,* the Supreme Court analyzed the issue of the deference a court should extend to an educational institution's decision in the due process context. *See* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). In *Ewing,* the plaintiff-medical student challenged his dismissal from medical school as arbitrary and capricious in violation of his substantive

due process rights. *See id.* at 217, 106 S.Ct. 507. The Court held that:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id.* at 225, 106 S.Ct. 507 (footnote omitted).

While the Court made this statement in the context of a due process violation claim, a majority of circuits have extended judicial deference to an educational institution's academic decisions in ADA and Rehabilitation Act cases. *See Doe v. New York Univ.,* 666 F.2d 761 (2d. Cir.1981); *McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850 (5th Cir.1993); *Wynne v. Tufts Univ. Sch. of Med. ("Wynne I"),* 932 F.2d 19 (1st. Cir.1991).[13] *But see Pushkin v. Regents of the Univ. of Colorado,* 658 F.2d 1372 (10th Cir.1981) (refusing to adopt deferential, rational basis test in evaluating educational institution's decisions in Rehabilitation Act case). These courts noted the limited ability of courts, "as contrasted to that of experienced educational administrators and professionals," to determine whether a student "would meet reasonable standards for academic and professional achievement established by a university," and have concluded that " '[c]ourts are particularly ill-equipped to evaluate academic performance.' " *Doe,* 666 F.2d at 775–76 (quoting *Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)).

We agree with the First, Second and Fifth circuits that an educational institution's academic decisions are entitled to deference. Thus, while we recognize that the ultimate determination of whether an individual is otherwise qualified must be made by the

---

**13.** Each circuit has, however, developed its own formulation of the deference standard. *Compare Doe,* 666 F.2d at 776 (holding that in determining whether a plaintiff is otherwise qualified to attend medical school, *"considerable judicial deference* must be paid to the evaluation made by the institution itself, absent proof that its stan-

dards and its application of them serve no other purpose than to deny an education to handicapped persons." (emphasis added)), *with McGregor,* 3 F.3d at 859 ("[A]bsent evidence of discriminatory intent or disparate impact, we must accord *reasonable deference* to the [school's] academic decisions." (emphasis added)).

court, we will extend judicial deference "to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons." *Doe*, 666 F.2d at 776.

■ Deference is also appropriately accorded an educational institution's determination that a reasonable accommodation is not available. Therefore, we agree with the First Circuit that "a court's duty is to first find the basic facts, giving due deference to the school, and then to evaluate whether those facts add up to a professional, academic judgment that reasonable accommodation is not available." *Wynne I*, 932 F.2d at 27–28; *see also McGregor*, 3 F.3d at 859 (the court must "accord deference to [the school's] decisions not to modify its programs [when] the proposed modifications entail academic decisions").

We recognize that extending deference to educational institutions must not impede our obligation to enforce the ADA and the Rehabilitation Act. Thus, we must be careful not to allow academic decisions to disguise truly discriminatory requirements. The educational institution has a "real obligation ... to seek suitable means of reasonably accommodating a handicapped person and to submit a factual record indicating that it conscientiously carried out this statutory obligation." *Wynne I*, 932 F.2d at 25–26. Once the educational institution has fulfilled this obligation, however, we will defer to its academic decisions.

### III

■ Having answered several preliminary questions, we now turn to the ultimate question—did Zukle establish a prima facie case of discrimination under the ADA or the Rehabilitation Act? As noted before, only the "otherwise qualified" prong of the prima facie case requirements is disputed by the parties. Zukle argues that she was otherwise qualified to remain at the Medical School, with the aid of the three accommodations she requested. The Medical School argues that Zukle's requested accommodations were not reasonable because they would have required a fundamental or substantial modification of its program. *See Alexander*, 469 U.S. at 300, 105 S.Ct. 712 (holding that institution subject to Rehabilitation Act may be required to make reasonable modifications to accommodate a disabled plaintiff, but need not make fundamental or substantial modifications).

Zukle bears the burden of pointing to the existence of a reasonable accommodation that would enable her to meet the Medical School's essential eligibility requirements. Once she meets this burden, the Medical School must show that Zukle's requested accommodation would fundamentally alter the nature of the school's program. We must determine, viewing the evidence in the light most favorable to Zukle, if there are any genuine issues of material fact with regard to the reasonableness of Zukle's requested accommodations. *See Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998).

■ We note at this stage that "[r]easonableness is not a constant. To the contrary, what is reasonable in a particular situation may not be reasonable in a different situation-even if the situational differences are relatively slight." *Wynne v. Tufts Univ. Sch. of Med.* ("*Wynne II*"), 976 F.2d 791, 795 (1st Cir.1992). Thus, we must evaluate Zukle's requests in light of the totality of her circumstances. *See Barnett*, 157 F.3d at 748 ("Whether a particular accommodation is reasonable depends on the circumstances of the individual case.").

The evidence is undisputed that the Medical School offered Zukle all of the accommodations that it normally offers learning disabled students. When the Medical School first learned of Zukle's disability she was offered double time on exams, notetaking services and textbooks ·on audio cassettes. Further, Zukle was allowed to retake courses, proceed on a decelerated schedule and remain at the Medical School despite being subject to dismissal under the Medical School's bylaws.

Even with these accommodations, Zukle consistently failed to achieve passing grades in her courses. Though Zukle was on a decelerated schedule, she continued to receive "Y" grades in her pre-clinical years and

failed the USMLE on her first attempt. Further, although she was able to remedy some of her failing grades in her pre-clinical years, she was only able to do so by retaking exams. Moreover, she received a "Y" grade in her first clinical clerkship, automatically placing her on academic probation, and an "F" in her second. Because Zukle received a failing grade while on academic probation, she was subject to dismissal pursuant to the Medical School's bylaws. Clearly, Zukle could not meet the Medical School's essential eligibility requirements without the additional accommodations she requested.

The issue, then, is whether the ADA and Rehabilitation Act required the Medical School to provide Zukle with those additional accommodations. As noted above, the Medical School was only required to provide Zukle with *reasonable* accommodations. Accordingly, we examine the reasonableness of Zukle's requested accommodations.

### A

Zukle claims that the Medical School should have granted her request to modify her schedule by beginning the first half of the Family Practice Clerkship instead of finishing the second half of her OB–GYN clerkship when she returned from retaking the USMLE. She proposed that she would then begin the Medicine clerkship, and finish Family Practice and OB–GYN at a later time.

The Regents presented evidence that granting this request would require a substantial modification of its curriculum. While the Medical School has granted some students reading time prior to the commencement of a clerkship, Dean Walsh testified that once a clerkship begins "all students are expected to complete the reading and other requirements of the clerkship, including night call and ward care, and to prepare themselves for the written exam which is given only at the end of the 8–week clerkship." Zukle's request would have entailed interrupting her OB–GYN clerkship, and starting the Medicine clerkship before finishing the Family Practice clerkship. Thus, by the time Zukle began the Medicine clerkship she would have had two uncompleted clerkships.

Dean Walsh testified that the only time the Medical School allows a student to begin a clerkship, interrupt it, and then return to that clerkship at a later point is when a student has failed the USMLE and needs time off to study. However, the student is still required to return to the same clerkship. Given that no student had been allowed to rearrange her clerkships in the manner Zukle requested and that Zukle's request would entail Zukle interrupting two courses to complete them at some later date, we have little difficulty concluding that this would be a substantial alteration of the Medical School's curriculum. *See Davis*, 442 U.S. at 413, 99 S.Ct. 2361 (holding that a school is not required to make substantial modifications to accommodate a handicapped student).

Zukle argues that the Medical School allowed numerous students to rearrange their clerkship schedules, and thus there is a material issue of fact as to whether her request was reasonable. However, while the students that Zukle mentions were allowed to remedy failing grades by retaking clerkships or exams, *none* was allowed to begin a clerkship, interrupt it, begin another clerkship, and retake the second half of the first clerkship at a later point. The facts are undisputed that no student had been allowed to rearrange their clerkship schedule as Zukle requested. Indeed, Zukle admitted in the district court that "no student has been permitted to finish an interrupted course in the fashion [she] requested because it would require substantial curricular alteration."[14] We defer to the Medical School's academic decision to require students to complete courses once they are begun and conclude, therefore, that this requested accommodation was not reasonable.

### B

Two weeks before the scheduled written exam in her Medicine clerkship, Zukle asked

---

14. Zukle stated that this statement was "undisputed" in her Response to Separate Statement of Undisputed Facts.

Dr. Silva, her advisor, if she could have more time to prepare for the exam because she was behind in the readings. Zukle testified that she specifically requested to leave the hospital early every day so that she could spend more time preparing for the written exam in Medicine. Dr. Silva and Zukle spoke with the Instructor of Record in Zukle's Medicine clerkship, Dr. Lawrence. Dr. Lawrence told Zukle that she could not excuse her from the in-hospital part of the clerkship. Dr. Lawrence testified that she denied this request because she thought that it would be unfair to the other students.

The Medical School presented uncontradicted evidence that giving Zukle reduced clinical time would have fundamentally altered the nature of the Medical School curriculum. The Medical School presented the affidavit of Dean Lewis in which he explained the significance of the clinical portion of the Medical School curriculum:

> The third-year clinical clerkships are designed to simulate the practice of medicine.... Depending on the specialty and the setting, students are generally required to be "on call" at the hospital through an evening and night one or more times each week. Other than these call nights, students remain at the hospital or clinic during day time hours on a schedule similar to that expected of clinicians.... Releasing a student from a significant number of scheduled hours during the course of a rotation would compromise the clerkship's curricular purpose, i.e. the simulation of medical practice.

We defer to the Medical School's academic decision that the in-hospital portion of a clerkship is a vital part of medical education and that allowing a student to be excused from this requirement would sacrifice the integrity of its program. Thus, we conclude that neither the ADA nor the Rehabilitation Act require the Medical School to make this accommodation.

In any event, the evidence shows that Zukle was not prejudiced by the Medical School's failure to grant this accommodation

because she in fact passed the Medicine written exam. *See Ellis v. Morehouse School of Medicine,* 925 F.Supp. 1529, 1548 (N.D.Ga. 1996) (noting that student was not prejudiced by failure to accommodate because he passed exam for which he was denied accommodation). Zukle's low score on the exam did not help her Medicine grade, but Zukle failed the clerkship because of her inadequate clinical performance. Indeed, as the district court stated, because Zukle was doing so poorly in the clinical portion of the clerkship, "[g]iving [her] time off from the clinical portion to study for the test[ ] could not have helped, but could only have further damaged, her already marginal clinical skills." Thus, Zukle did not establish that she would have been able to meet the Medical School's requirements with the requested accommodation.

C

Finally, after she was dismissed, Zukle requested that the *ad hoc* Board place her on a decelerated schedule during the clinical portion of her studies. Specifically, Zukle sought eight weeks off before each clerkship to read the assigned text for that clerkship in its entirety.[15]

Zukle presented evidence that the Medical School regularly allowed students to proceed on a decelerated schedule. Indeed, Zukle herself was allowed an extra year to complete the pre-clinical curriculum. However, no student had been provided the specific accommodation that Zukle requested, i.e., taking eight weeks off between clerkships. Furthermore, simply because the Medical School had granted other students' requests to proceed on a decelerated schedule, does not mean that Zukle's request was reasonable. The reasonableness of Zukle's request must be evaluated in light of Zukle's particular circumstances.

We agree with the district court that the Board's denial of Zukle's request to proceed on a decelerated schedule was a "rationally justifiable conclusion." *See Wynne II,* 976 F.2d at 793 (quoting *Wynne I,* 932 F.2d at

---

**15.** The Regents allege that Zukle has abandoned this argument on appeal. While Zukle's presentation of this issue in her opening brief is not

extensive, we do not feel that it is so lacking that she can be said to have abandoned it.

26). The Board noted that, even on a decelerated schedule during the pre-clinical phase, Zukle experienced severe academic difficulties: Zukle earned deficient grades in five courses and failed the USMLE exam on her first attempt even though she had taken several pre-clinical courses twice. The Board noted that there is "a fair amount of overlap on written exams of material from second-year courses and that the clinical work overlaps with the written." In sum, the evidence makes clear that the decelerated schedule would not have aided Zukle in meeting the Medical School's academic standards. Given Zukle's unenviable academic record, allowing her to remain in Medical School on a decelerated schedule would have lowered the Medical School's academic standards, which it was not required to do to accommodate Zukle. *See Davis,* 442 U.S. at 413, 99 S.Ct. 2361.[16]

## IV

In conclusion, we are persuaded that Zukle failed to establish that she could meet the essential eligibility requirements of the Medical School with the aid of reasonable accommodations. Accordingly, she failed to establish a prima facie case of disability discrimination under the ADA or the Rehabilitation Act.

AFFIRMED.

---

**16.** Furthermore, Zukle requested this accommodation after the Medical School's decision to dismiss her. At no time prior to her dismissal did she request that the Medical School place her on a decelerated schedule. Her failure to request this accommodation earlier contributes to our finding of unreasonableness. *See Wynne II,* 976 F.2d at 796 n. 3 (finding relevant to reasonableness inquiry the fact that student did not ask for accommodation "until after [the school] sent him packing and adversary proceedings were underway").