Marcus Todd HASH, Appellant,

v.

UNIVERSITY OF KENTUCKY,
Appellee.

No. 2003–CA–001007–MR.

Court of Appeals of Kentucky.

June 11, 2004.

Edward E. Dove, Lexington, KY, for appellant.

Stephen L. Barker, Joshua Michael Salsburey, Sturgill, Turner, Barker & Moloney, PLLC, Lexington, KY, for appellee.

Before COMBS, Chief Judge, TACKETT and VANMETER, Judges.

## OPINION

VANMETER, Judge.

Appellant, Marcus Todd Hash, appeals an order of the Fayette Circuit Court granting appellee's motion for summary judgment. Having concluded that there are no genuine issues as to any material fact and that the University of Kentucky was entitled to judgment as a matter of law, we affirm.

Appellant was admitted to the University of Kentucky College of Law ("University") for the fall semester of the 1998–1999 academic year. Into his first semester, appellant began to feel the effects of his battle with depression. Upon informing a few of his professors, Dean Louise Graham indicated to appellant that he should consider withdrawing and return in the fall of 1999. Prior to taking his final exams, appellant withdrew from the University with the intention of returning in 1999.[1] However, appellant failed to meet the deadlines for readmission because he thought that it would be automatic and "not a problem."

Appellant submitted his application for the 2000–2001 academic year on March 2, 2000, which was one-day late.[2] Given that the application was late, the admissions committee did not consider it until they had reviewed all the timely applications. On April 18, 2000, appellant received a standard rejection letter from the University stating that his application was denied.

---

1. Appellant argues that he did not voluntarily withdraw, but that he was urged to leave for medical reasons. However, appellant offered no proof to support this argument and nothing in the record suggests that this is a material issue of fact.

2. Appellant alleges that his application was filed on March 1, 2000, but that for some unknown reason it was not stamped until March 2, 2000. However, in the deposition of Dean Drusilla Bakert, upon being questioned about this issue, appellant's attorney acknowledged that the application was in fact late, stating: "I don't want to be in a fight with [appellee's attorney] over that. It doesn't matter because the application was late anyway." *See Depo. of Drusilla V. Bakert,* pg. 115, lines 12–14.

On August 1, 2000, appellant submitted an appeal for reconsideration, but the University was not persuaded. On August 1, 2001, appellant filed a complaint against the University in the Fayette County Circuit Court for unlawful discrimination in violation of Kentucky's Civil Rights Act, KRS 344, *et seq.*, alleging that he was discriminated against because of his disability. Upon granting the University's motion for summary judgment, the circuit court held that the University's decision to deny appellant's admission was not based solely on his disability and that appellant had failed to prove that he was an otherwise qualified candidate despite his disability. This appeal followed.

■ First, appellant argues that he was qualified for admission in 2000 because his LSAT score and undergraduate grade point average were the same as in his 1998 application, and therefore the admissions committee must have based the rejection solely on his disability. We disagree.

Appellant's March 2000 application and his appeal for reconsideration are all that's relevant for our review, as appellant was admitted to the University for the 1998–1999 academic year. Furthermore, the 1998 application is irrelevant given that appellant withdrew prior to completing his first semester, which according to the University's rules and policies, appellant was required to re-apply since admission was not automatic.[3] As such, no material issue of fact exists regarding whether appellant was otherwise qualified for admission based on his 1998–1999 application; only appellant's March 2000 application and August 2000 appeal for reconsideration are applicable here.

■ In construing the Kentucky Civil Rights Act, KRS 344.010, *et seq.*, Kentucky courts commonly refer to decisions interpreting the similar federal laws. *Noel v. Elk Brand Mfg. Co.*, Ky.App., 53 S.W.3d 95, 100–01 (2000); *Kreate v. Disabled American Veterans*, Ky.App., 33 S.W.3d 176, 178 (2000); *see Brohm, M.D. v. JH Properties, Inc.*, 149 F.3d 517, 520 (6th Cir.1998) (KRS 344 mirrors the language of the American with Disabilities Act ("ADA") and the Rehabilitation Act, which both forbid discrimination on the basis of disability). In *Pushkin v. The Regents of the University of Colorado*, 658 F.2d 1372, 1387 (10th Cir.1981), the court set forth the appropriate standard for our review:

1) The plaintiff must establish a prima facie case by showing that he was an otherwise qualified handicapped person *apart from* his handicap, and was rejected under circumstances which gave rise to the inference that his rejection was based solely on his handicap;

2) Once plaintiff establishes his prima facie case, defendants have the burden of going forward and proving that plaintiff was not an otherwise qualified handicapped person, that is one who is able to meet all of the program's requirements *in spite of* his handicap, or that his rejection from the program was for reasons other than his handicap;

3) The plaintiff then has the burden of going forward with rebuttal evidence showing that the defendants' reasons

3. The University's Rules and Policies, Section VI. Withdrawal by Students (adopted by the University Senate 4/12/93), states in pertinent part: "(B)(1) First-year students are expected to complete their first year of law study without interruption. If a student withdraws from the College and University during his or her first semester of law study, readmission is not automatic. If a student withdraws during the first semester of law study, applications for readmission will be referred to the Admissions Committee."

for rejecting the plaintiff are based on misconceptions or unfounded factual conclusions, and that reasons articulated for the rejection other than the handicap encompass unjustified consideration of the handicap itself. *See Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Davis*, 442 U.S. at 406, 99 S.Ct. at 2367. *See also School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 288 n. 17, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987). Thus, the principal issue for our review is whether appellant established his prima facie case with evidence that he was "otherwise qualified" for admission for the 2000–2001 academic year.

The appropriate analysis for the present case is found in *Doe v. New York University*, 666 F.2d 761 (2nd Cir.1981), in which an applicant was accepted for admission into medical school even though she falsely represented in her application that she did not have chronic or recurrent emotional problems. Upon undergoing a medical examination during the first semester the treating physician recognized scars on her arms, which suggested self-abuse. Despite the misrepresentation in her application, she was allowed to stay at NYU if she undertook psychiatric therapy. After failed attempts for rehabilita-

tion, the student reverted to her past coping mechanisms, which resulted in a leave of absence. The student's readmission application was subsequently denied.[4]

In reaching its decision, the court stated:

Turning to the [Rehabilitation] Act's term, "otherwise qualified handicapped individual," it is now clear that this refers to a person who is qualified *in spite of* her handicap and that **an institution is not required to disregard the disabilities of a handicapped applicant, provided the handicap is relevant to reasonable qualifications for acceptance,** or to make substantial modifications in its reasonable standards or program to accommodate handicapped individuals **but may take an applicant's handicap into consideration, along with all other relevant factors, in determining whether she is qualified for admission.**

*Doe*, 666 F.2d at 775 (emphasis added). *See Davis*, 442 U.S. at 406, 99 S.Ct at 2367. Here, the admissions committee only considered appellant's disability in conjunction with other relevant factors, such as the timeliness of his 2000 application, in determining that he was not qualified for admission.[5] The University's decision was not based solely on appellant's disability, but it was taken into account, as his March 2000 application and August 2000 appeal for reconsideration raise numerous relevant issues, which could not be disregarded.

---

**4.** Appellant argues that the circuit court erroneously applied *Doe* to the present case; however, the facts of the present case are not as different as appellant suggests. 666 F.2d at 775. Similar to a medical school's admission process, a law school is entitled to consider a candidate's psychological and emotional problems, as any mental impairment may be relevant to the individual's ability to cope with the stresses of law school, the ability to deal with constant pressures from other students and professors, and to withstand the

demands associated with classroom attendance and participation. *See Doe*, 666 F.2d at 777.

**5.** The record indicates that the University does not review late applications until all the timely applications are reviewed first. According to this system, many, if not all, of the available positions may be eliminated prior to the University's review of late applications.

First, the University was concerned for the safety of the already admitted students, in addition to the stability of appellant's mental illness.[6] For instance, in appellant's March 2000 personal statement, he explains:

I realize that all this bouncing from one doctor to another may not sound like the greatest means for making the glorious recovery that the Admissions Committee might want to hear, but one thing I've learned from other patients, health professionals and my readings is that often it takes a number of missteps before finding just the right physician and treatment plan ... So you see, I can't make the Admission Committee any guarantees about my health and I seriously doubt that a doctor or Maytag repair man could either.

Moreover, in appellant's August 2000 appeal for reconsideration, he stated in pertinent part:

So here I am today, presenting you with one of the more offbeat appeals you'll have ever seen so please don't confuse it's [sic] tone or look for lack of seriousness, because in the immortal words of Willy Wonka: "A little [ ] now and then, is relished by the wisest men." ... I have faith in UK Law and I think it's time to see if UK Law has faith in its ability to help an individual student overcome any obstacle that may arise, rather than letting a former student twist in the wind until it is "safe" for him to be readmitted.

In short, it's time for Todd Hash and UK Law to "put up or shut up."

In his appeal, appellant also included quotes from characters in movies and television shows, a picture of a professional wrestler, and newspaper articles about mental illnesses. Most notable to the admissions committee was an article quoting the University of North Carolina law student who was diagnosed with paranoid schizophrenia after he "marched down a Chapel Hill street randomly firing his father's M–1 rifle."

Dean Bakert sent appellant a letter in response to the appeal and stated:

It is clear that you have put a lot of work into the information that you sent, but I could not gather from your submission whether there is any new information regarding your application for readmission or your medical situation. To date we have not received any communication directly from your doctors that describes the current state of your health or whether it is advisable at this time for you to re-enter law school.

Dean Bakert subsequently received correspondence from two undergraduate professors and three doctors. On August 16, 2000, Dean Bakert requested that appellant sign a general medical release form, while also advising him that since the physician's letters raised a number of new issues, the admissions committee would be unable to resolve those issues in enough time for appellant to begin classes for the fall 2000 semester.[7]

In the August 16 letter, Dean Bakert also requested that appellant be evaluated by a doctor of the University's choice,

---

6. In *Anderson v. University of Wisconsin*, 841 F.2d 737, 740 (7th Cir.1988), a disabled alcoholic law student whose grade point average fell below 77 was not qualified unless "the source of the academic problem [was] abated, making future work of satisfactory quality likely."

7. Apparently, Dean Bakert made a unilateral decision to deny appellant's appeal for reconsideration, as the admissions committee was not in session and the appeal was submitted less than a month before fall classes began. Even so, Dean Bakert encouraged appellant to reapply for the 2001 academic year.

"[b]ecause I had 400 students starting law school in three days, I had a candidate sending me information about law students shooting people and I wanted to be sure as I could be of the safety of those students."[8] Clearly, the University was not only concerned for the stabilization of appellant's disability, but also for the safety of its students. If it were not concerned, any harm done by appellant to himself, the faculty, or other students might expose the University "to legal liability for knowingly permitting such exposure." *Doe,* 666 F.2d at 777.

■ Second, the University used its best professional judgment in determining whether appellant was qualified. In *Anderson v. University of Wisconsin,* 841 F.2d 737, 741 (7th Cir.1988), the court stated:

> The [Rehabilitation] Act does not designate a jury, rather than the faculty of the Law School, as the body to decide whether a would-be student is up to snuff. The Law School may set standards for itself, and jurors unacquainted with the academic program of a law school could not make the readmissions decision more accurately than the faculty of the Law School; the process of litigation would change the substantive standard in addition to raising the costs of its application. The Supreme Court has repeatedly admonished courts to re-

spect the academic judgment of university faculties.[9]

*See Regents of University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). The ultimate question is whether the University discriminated against appellant because of his disability. The issue is not whether the University made a correct decision. *Id.* A university has wide discretion in making judgments "so long as its behavior is not so arbitrary or irrational as to not constitute an exercise of professional judgment." *el Kouni v. Trustees of Boston University,* 169 F.Supp.2d 1, 4 (D.Mass.2001). *See also Wynne v. Tufts University School of Medicine,* 932 F.2d 19, 25–6 (1st Cir.1991); *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985). True, educational institutions do not have unlimited deference, as courts "must be careful not to allow academic decisions to disguise truly discriminatory requirements." *Zukle v. Regents of the University of California,* 166 F.3d 1041, 1048 (9th Cir.1999). However, suggesting that the University's decision was incorrect does not necessarily mean that it violated the Kentucky Civil Rights Act.

■ A third relevant factor employed by the University in making its decision was based on the University's academic

8. *See Depo. of Drusilla V. Bakert,* pg. 63, lines 21–25. Despite appellant's contention, there is no affirmative evidence suggesting that the University's request for appellant to be reviewed by a doctor of the University's choice is a genuine issue of material fact.

9. Appellant argues that the circuit court erroneously relied on *Anderson,* in which the law school refused to readmit a former alcoholic student for the third time because his grade point average fell below 77. 841 F.2d at 740–41. Appellant contends that in the present

case, the University had no direct evidence that he was not qualified, such as a grade point average, and appellant was never readmitted to the University, which was their way of negating the stereotypical fears about persons with mental illnesses. However, nothing in the record suggests that the University's decision was based on stereotypes, as opposed to honest judgments about appellant's depression and the many other relevant factors as explained above.

standards. In *Anderson* the court stressed, "[a]lthough inability to perform at the required standard as a result of a handicap makes a person not 'otherwise qualified', a court still must decide what that standard is. The meaning of a standard lies in the method of its application." [10] 841 F.2d at 740. Also, "if the handicap could reasonably be viewed as posing a substantial risk that the applicant would be unable to meet its reasonable standards, the institution is not obligated by the [Rehabilitation] Act to alter, dilute or bend them to admit the handicapped applicant." *Doe*, 666 F.2d at 775 (relying on *Davis*, 442 U.S. at 413 n. 12, 99 S.Ct. at 2370).

 Here, the record indicates that the University's academic standards encompass successful time management, fulfilling scheduled deadlines, engagement in Socratic classroom discussions and successful performance on intense examinations, which are all an integral part of completing the legal education and preparing for success as a practicing attorney. As such, the qualification of a disabled individual "turns not only on whether he or she meets its reasonable standards but whether the individual, where a few ... must be chosen out of thousands of applicants, is as well qualified despite the handicap as others accepted for one of the limited number of openings." *Doe*, 666 F.2d at 776. Accordingly, the University concluded, in its professional judgment, and based on the reasonable academic standards in place that appellant was not a qualified applicant in spite of his depression. [11]

Therefore, we find that appellant failed to prove his prima facie case, as he was not an "otherwise qualified handicapped person" apart from his disability. *Pushkin*, 658 F.2d at 1387. The University was entitled to summary judgment as a matter of law. [12] *Hubble v. Johnson*, Ky., 841 S.W.2d 169, 171 (1992); *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476, 480 (1991).

Based on the foregoing, the order of the Fayette Circuit Court is affirmed.

ALL CONCUR.

---

**10.** In *Anderson,* the court concluded that the standard used by the committee was that a student is not "qualified" if his average falls below 77. 841 F.2d at 740.

**11.** Appellant also alleges that the University failed to "seek suitable means of reasonably accommodating a handicapped person...." *Zukle,* 166 F.3d at 1048. However, it is well settled that the individual with the disability has the responsibility to inform the institution that a reasonable accommodation is needed, as it does not become an issue if the person has never requested one. *Gantt v. Wilson Sporting Goods Company,* 143 F.3d 1042, 1046 n. 6 (6th Cir.1998). *See also Lue v. Moore,* 43 F.3d 1203, 1206 (8th Cir.1994); *Wood v. President & Trustees of Spring Hill College,* 978 F.2d 1214, 1222 (11th Cir.1992). Appellant has failed to include any evidence suggesting that he requested an accommoda-

tion or that the University refused to provide an accommodation. Thus, no material issue exists.

**12.** Appellant argues that the circuit court erroneously accepted as fact all the assertions of the University, which denied him the benefit of having all factual inferences drawn in favor of the nonmoving party. However, the circuit court did not err, as we have previously stated, "[t]he standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. There is no requirement that the appellate court defer to the trial court since factual findings are not at issue." *Scifres v. Kraft,* Ky.App., 916 S.W.2d 779, 781 (1996) (citations omitted).