# IN THE SUPREME COURT OF IOWA

No. 11–1145

Filed June 28, 2013

**SUNRISE RETIREMENT COMMUNITY, FRIENDSHIP HAVEN, PRESBYTERIAN VILLAGE, ROSE VISTA HOME, LONGVIEW HOME, UNITED PRESBYTERIAN HOME, RICEVILLE COMMUNITY REST HOME, HUBBARD CARE CENTER,** and **HAPPY SIESTA CARE CENTER,**

Appellants,

vs.

**IOWA DEPARTMENT OF HUMAN SERVICES,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

The Iowa Department of Human Services requested further review of a decision of the court of appeals reversing the agency's disallowance of certain expenses from cost reports submitted by nursing homes. **DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS.**

Patrick B. White of White Law Office, P.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, and Timothy L. Vavricek, Assistant Attorney General, for appellee.

**HECHT, Justice.**

Several nursing homes submitted annual reports disclosing their income and expenses to the Iowa Department of Human Services (DHS). The reports were used by DHS to calculate the Medicaid per diem reimbursement rates for the nursing homes. Some of the nursing homes' expenses were disallowed by DHS, which adjusted those reports and reduced reimbursement rates accordingly. We must decide in this appeal whether DHS properly interpreted and applied its departmental rules in setting the rates. As we conclude the agency's action was based on an incorrect interpretation of its rules, we reverse and remand.

## I. Background Facts and Proceedings.

Sunrise Retirement Community, Friendship Haven, Presbyterian Village, Rose Vista Home, Longview Home, United Presbyterian Home, Riceville Community Rest Home, Hubbard Care Center, and Happy Siesta Care Center are long-term care facilities licensed in Iowa and approved by DHS as Medicaid providers. Each of these facilities accepts patients with different payment sources—e.g., private payment, Medicare, and Medicaid.

To participate in Medicaid, each facility must submit a "Financial and Statistical Report" annually to DHS. The report details the facility's overall operating costs and sources of revenue. The information submitted on the report is used by DHS to calculate a per diem reimbursement rate for each participating facility.

The per diem rate is not designed to reimburse nursing facilities for their precise costs incurred in caring for Medicaid patients. Instead, DHS calculates rates after determining a facility's allowable costs, which are derived from a facility-specific reporting system. In this system, each facility reports all costs incurred and revenue received from all sources in

its annual financial and statistical report. An accounting firm employed by DHS then reviews the reports to determine which costs are allowable under the agency's rules when calculating the appropriate Medicaid per diem rate.

In submitting their cost reports for the fiscal year ending December 31, 2008, the appellant care facilities included in their reports costs incurred for services provided to residents whose primary source of payment was Medicare Part A. DHS deemed some of these costs disallowed.

When a resident is admitted with Medicare Part A as a payor, a facility bears up front all costs of treatment and care for the resident. This is true even when the resident receives treatment or care outside the facility, such as when he or she is sent to a local provider for an x-ray or lab work. In these cases, the outside provider bills the nursing facility directly for its services, including the three types of services at issue in this case—prescription drugs, x-rays, and lab work. The outside provider may not bill the resident directly and may not bill Medicare. Instead, Medicare provides a per diem payment to the nursing facility for each resident intended to cover all care, treatment, and services for that resident. Medicaid, by contrast, pays the Medicaid patients' outside providers of prescription drugs, x-rays, and lab work directly.

In this case, most of the facilities included in their Medicaid cost reports costs incurred on behalf of Medicare patients for x-rays, lab work, and prescription drugs. DHS contends that including these categories of costs in reports used to calculate the Medicaid per diem reimbursement rate would result in "double-counting." The facilities maintain that DHS regulations allow, if not require, the inclusion of these costs.

In 2008, DHS determined these costs were not allowable and therefore excluded them from the cost reports. This marked a departure from prior practice. Until the 2008 adjustments, DHS had allowed the facilities to include in the cost reports the costs paid to third parties for lab services, x-rays, and prescription drugs provided to Medicare patients.[1] The facilities appealed the adjustments, and a contested case hearing was held. A proposed decision was issued by an administrative law judge who concluded the costs incurred by the facilities for x-rays, lab work, and prescription drugs provided to Medicare patients were properly reported by the nursing homes. The ALJ elaborated:

> At the hearing, the Department opined that [Medicare] Part A costs should be excluded because the costs are covered/paid for by the Medicare per diem and if the costs were included in the Medicaid per diem calculation, it would artificially inflate the Medicaid rate. This argument by the Department lacks merit however since the Medicare Part A revenue is also reported by the facility as a part of the cost report and already part of the equation. Moreover, the Department conceded that it could perform an offset to account for the costs/revenue associated with costs for a Part A resident. As such, the Department has a methodology for dealing with this perceived "enrichment" without disallowing the costs on the Medicaid cost report.

DHS requested intra-agency review, and the director of human services issued a final decision which accepted the ALJ's fact findings but concluded the costs should be disallowed on the cost reports. The facilities sought judicial review, and the district court affirmed the director's decision. The facilities appealed. The court of appeals reversed the district court, concluding the DHS rules did not support the agency's

---

[1]Although DHS had never objected to the reporting of prescription drug expenses incurred for Medicare patients prior to 2008, it had apparently excluded those expenses from its Medicaid per diem calculations for prior years.

determination that the costs in question were not allowable. DHS sought, and we granted, further review.

## II. Standard of Review.

Final agency action is reviewed for corrections of errors at law. *Eyecare v. Dep't of Human Servs.*, 770 N.W.2d 832, 835 (Iowa 2009). We apply the standards of chapter 17A of the Iowa Administrative Procedure Act to agency action to determine if our conclusions are the same as the district court's conclusions. *Id.* We are bound by the agency's findings of facts if they are supported by substantial evidence. *Id.* We will not, however, defer to DHS's interpretation of its rules and regulations, as it has not been clearly vested with the authority to interpret them. *Id.* at 836; *see also* Iowa Code § 17A.19(10)(*c*) (2009).

## III. Discussion.

Iowa Code chapter 249A governs Iowa's Medicaid program. Section 249A.4(1) instructs the director of DHS to

> make rules, establish policies, and prescribe procedures to . . . [d]etermine the greatest amount, duration, and scope of assistance which may be provided, and the broadest range of eligible individuals to whom assistance may effectively be provided, under this chapter within the limitations of available funds.

Iowa Code § 249A.4(1). Section 249A.4(9) directs DHS to adopt rules for determining the method and level of reimbursement for all medical and health services specified in section 249A.2 after considering the following goals:

> *a.* The promotion of efficient and cost-effective delivery of medical and health services.

> *b.* Compliance with federal law and regulations.

> *c.* The level of state and federal appropriations for medical assistance.

  *d.* Reimbursement at a level as near as possible to actual costs and charges after priority is given to the considerations in paragraphs "*a*", "*b*", and "*c*".

*Id.* § 249A.4(9).

All nursing facilities wishing to participate in and receive funds from the Medicaid program must submit an annual "Financial and Statistical Report" to facilitate DHS's calculation of the Medicaid per diem rate. *See* Iowa Admin. Code r. 441—81.6 (2009). The report must detail both revenues and costs associated with patient care according to the subrules of rule 81.6. *Id.* Subrule 81.6(10) requires that facilities report all revenues, as recorded in their general books and records, associated with their provision of any routine daily services and any ancillary services to patients. *Id.* r. 441—81.6(10)(*a*)–(*b*). The costs portion of the report must be divided into categories of direct patient care costs and support care costs.[2] *Id.* r. 441—81.6. Subrule 81.6(11) further provides that certain costs "not normally incurred in providing patient care shall be eliminated or limited" according to a long list of limitations, none of which make reference to direct care or Medicare-related costs.[3] *Id.* r. 441—81.6(11).

DHS determines per diem reimbursement rates based on a multi-step calculation. *Id.* r. 441—81.6(16). First, DHS establishes per diem direct care and nondirect care component cost bases for the facilities based on the costs reported. *Id.* DHS then adjusts those component bases for various purposes in subsequent steps having no bearing on the

---

[2]The parties appear to agree that costs incurred for x-rays, prescription drugs, and labs constitute direct care costs.

[3]The enumerated limitations include, but are not limited to, federal and state income taxes, fees paid to directors, bad debts, personal travel and entertainment, loan acquisition fees, management fees, depreciation, and legal fees. Iowa Admin. Code r. 441—81.6(11).

types of costs to be incorporated in establishing the bases. *See id.* To establish the component cost bases, subrule 81.6(16) provides that each facility's "per diem allowable cost shall be arrived at by dividing total reported allowable costs by total inpatient days during the reporting period." *Id.* r. 441—81.6(16)(*a*). Rule 81.1 defines "allowable costs" as "the price a prudent, cost-conscious buyer would pay a willing seller for goods or services in an arm's-length transaction, not to exceed the limitations set out in rules." *Id.* r. 441—81.1. As we have noted, subrule 81.6(11) identifies fifteen different "limitations" of expenses—expenses that must be limited or disallowed in some way—but fails to mention Medicare expenses. *See id.* r. 441—81.6(11). In fact, no provision anywhere in rule 81.6 makes any reference to Medicare in association with the annual cost reports required of the nursing facilities.[4] *See id.* r. 441—81.6. Instead, rule 81.6 tersely and generally directs that "costs for patient care services shall be reported." *Id.*

Interpreting these rules in the final agency action below, the director of DHS affirmed the agency's cost report adjustments disallowing x-ray, lab, and prescription drug expenses on two grounds. First, the director concluded the list of allowable cost limitations in subrule 81.6(11) did not constitute "an all-inclusive list of expenses disallowed in the facility's cost report." Thus, the director concluded he could also

---

[4]Subrule 81.6(20) authorizes facilities' claims "for Medicaid payment for Medicare-covered nursing facility services rendered to a Medicare beneficiary who is also eligible for Medicaid." *See id.* r. 441—81.6(20)(*a*). This provision aims to insure that (1) claims are adequately reimbursed if the Medicaid-allowable amounts for the claims exceed the actual Medicare payments made, and (2) claims for services fully reimbursed by Medicare receive no additional Medicaid reimbursement. *See id.* r. 441—81.6(20). The record does not reveal and the parties do not address what, if any, bearing this provision may have on the propriety of incorporating costs for services provided to Medicare patients that are not fully covered by Medicare reimbursement in determining a facility's Medicaid component cost bases under subrule 81.6(16).

disallow costs for x-rays, labs, and drugs provided to Medicare patients because Medicaid pays third-party vendors directly for those kinds of services when they are provided to Medicaid patients. Second, the director concluded that costs associated with x-rays, labs, and prescription drugs for Medicare patients do not meet rule 81.1's definition of allowable costs because "they are not costs a prudent, cost-conscious buyer would pay a willing seller." The district court affirmed the director's decision, agreeing that x-rays, labs, and drugs "are not properly included in the cost that a prudent, cost-conscious buyer would pay for nursing care services at [appellants'] facilities in an arm's-length transaction."

Addressing first the director's subrule 81.6(11) justification, we take no position as to whether the expenses enumerated as excludable under the rule constitute an exhaustive list. Regardless, we cannot conclude that a determination of whether the list is exhaustive is dispositive of the cost question here. Instead, we note that the language of the subrule expressly limits the types of costs that shall be "eliminated or limited" in confining its reach to "[c]ertain expenses that are not normally incurred in providing patient care . . . ." *Id.* r. 441—81.6(11). We think it straightforward to conclude, and the parties agreed both below and on appeal, that the lab, x-ray, and drug expenses at issue here are normally incurred in providing patient care. Indeed, DHS's accountant testified in the agency proceeding below that facilities do and must regularly provide these services, regardless of payor type, to meet DHS's minimum requirements for provision of essential services to their patients. Thus, regardless whether subrule 81.6(11) may contemplate the elimination of costs not normally incurred in providing patient care

and not expressly enumerated, we cannot conclude the subrule has any bearing on the question of the regularly incurred costs here.

If the director's conclusion may be read to suggest implicitly that subrule 81.6(11) requires elimination of all expenses not normally incurred in providing "Medicaid patient care," as opposed to the broader category of "patient care" expressly set forth in the subrule, we find no support for that contention in the language of the subrule, the language of rule 81.6 more generally, or in the standard practices of DHS. Subrule 81.6(11) mentions Medicaid only in the context of allowing legal fees related to defending threatened Medicaid decertification and, as noted, makes no mention of Medicare.[5]  *See id.* r. 441—81.6(11). Further, given the specific references in rule 81.6 to Medicaid and Medicare where necessary to distinguish them as payment systems, we are not persuaded that the silence of subrule 81.6(11) envisages an unwritten Medicaid limitation.  Instead, we think the structure of rule 81.6 compels the broader reading—namely, that facilities report all revenues regardless of payor type, as conceded by the parties and contemplated by subrule 81.6(10), and likewise facilities report all costs regardless of payor type as contemplated by the introductory paragraph of rule 81.6 before certain limitations are applied in accordance with subrule 81.6(11).  Finally, we note that DHS concedes it does not exclude from cost reports expenses incurred for other services provided to Medicare patients, including, for example, various therapy services.  We thus cannot conclude, as the director did, that rule 81.6 supports

---

[5]The subrule also never distinguishes between types of payors in establishing its various limitations.  *See, e.g.*, *id.* r. 441—81.6(11)(*f*) (allowing expenses for entertainment provided for "participation of all residents who are physically and mentally able to participate" and eliminating only expenses for entertainment for which patient is required to pay); *id.* r. 441—81.6(11)(*h*) (allowing reasonable costs for services provided by immediate relatives and remaining silent regarding payor type).

excluding the costs of the challenged services provided to Medicare patients.

Turning to the director's second ground for affirming the elimination of the costs in question here, we find no support for the elimination in the definition of "allowable costs" in rule 81.1. Because the definition refers only to the "*price* a prudent, cost-conscious buyer would pay a willing seller for goods or services in an arm's-length transaction" and specifies that the *price* cannot "exceed the limitations set out in rules," we cannot conclude the definition has anything to say about elimination of the entire category of Medicare patient-related costs or, more importantly, a specific subset of that category of costs including x-ray, lab, and prescription drug costs. *Id.* r. 441—81.1 (emphasis added). The director supported his conclusion with the rationale—and DHS has raised the argument again on appeal—that because the x-ray, lab, and drug costs are costs for Medicare patients, "they are not costs a prudent, cost-conscious buyer would pay a willing seller" for services to *Medicaid* patients. This rationale, in our view, relies either on adding modifying language to the definition expressly set out in the rule, or on a general assumption that the definition applies only to costs of services provided to Medicaid patients. Given the structure of rule 81.6 and the Department's concession that "allowable costs" in some instances encompass non-Medicaid costs, we are not persuaded the definition can be read to imply a general limitation of its applicability to costs provided to Medicaid patients. As for the possibility of implicit modifying language, we note two additional problems with the position advanced by DHS.

First, the definition of "allowable cost" makes no distinction between Medicaid and Medicare services and no distinction between

buyers and sellers of Medicaid and Medicare services. We find it instructive that various other definitions in rule 81.1 make no such distinction. For example, the definitions of "case mix" and "case-mix index," integral to the per diem calculation in subrule 81.6(16), are silent regarding payor types. *See id.* r. 441—81.1. Moreover, as explained, rule 81.6 largely lumps all services together for reporting and per diem calculation purposes. We cannot discern any reason in the language or structure of rules 81.1 or 81.6 to import the director's "buyer of Medicaid services" limitation into the definition.

Second, in adopting the ALJ's conclusions of law, the director conceded both that (1) subrule 81.10(5)(*c*) expressly provides that the Medicaid program will provide direct payment to facilities for the provision of some services required by Medicare; and (2) subrule 81.10(2) expressly requires that a facility must, when applicable, first exhaust all Medicare benefits to remain eligible for any Medicaid payment. We cannot conclude, based on these rules, that the Medicaid program is to be treated as a buyer of strictly Medicare or strictly Medicaid services—rather, we think the rules explicitly envision that the program may reimburse facilities for provision of both Medicare and Medicaid services and that any specific instance of a service for which a facility receives reimbursement may simultaneously constitute a "Medicare" and "Medicaid" service. These propositions, taken together with the concession that facilities must provide lab, x-ray, and drug services regardless of payment type, compel our conclusion that the definition of "allowable costs" is silent regarding the inclusion or exclusion of a class of Medicare costs, and cannot be read to incorporate the Medicaid limitation the director advanced.

We think it prudent to note that whether an expense is reported may not be dispositive of whether DHS incorporates that expense in its component base-rate calculation. The ALJ noted the availability of an "offset" that could occur between facility cost reporting and DHS rate-setting.[6] As we conclude here, however, the director's interpretation of the rules as written cannot support the agency's decision to exclude the Medicare costs at issue from the facilities' cost reporting.

We recognize the cost-containment concerns driving the agency action here. We also acknowledge the significant challenges underlying the director's statutorily prescribed duty to "[d]etermine the greatest amount, duration, and scope of assistance which may be provided, and the broadest range of eligible individuals to whom assistance may effectively be provided" in administering the Medicaid program. Iowa Code § 249A.4(1). The difference between the meaning the director has assigned to the rules and the meaning we are able to discern clearly engages these policy concerns and raises questions as to what costs should be considered in calculating Medicaid reimbursement rates. Nevertheless, our task in this case is to determine the meaning of the rules at issue and decide whether the director has erred in interpreting them. Given the agency's abrupt about-face in its practice regarding exclusion of certain costs from reports, and the substantial disparity between what the rules plainly say and what the director now suggests they mean, we think DHS's new interpretation of rule 81.6's cost reporting and per diem calculation procedures is akin to the creation of a new rule. The appropriate course of action here cannot involve assigning

---

[6]The nursing homes concede that to the extent Medicare prescription drug, x-ray, and lab costs are properly reportable, the reports should also include the corresponding Medicare revenue for those services.

new meanings to rules not fairly evident from the language of the rules themselves. Instead, in our view, the appropriate course requires new rulemaking according to the procedures set forth in Iowa Code chapter 17A, which allows all relevant stakeholders adequate notice and meaningful opportunity to address and help resolve the important policy questions at stake.

## IV. Conclusion.

The director's conclusion affirming the agency's exclusion of the facilities' lab, x-ray, and prescription drug costs from the nursing homes' reports was erroneous. We affirm the decision of the court of appeals, reverse the district court judgment, and remand to the district court. The district court shall enter judgment remanding this matter to DHS for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS.**