# IN THE SUPREME COURT OF IOWA

No. 12–0924

Filed June 27, 2014

**PALMER COLLEGE OF CHIROPRACTIC,**

Appellee,

vs.

**DAVENPORT CIVIL RIGHTS COMMISSION** and **AARON CANNON,**

Appellants.

Appeal from the Iowa District Court for Scott County, Gary D. McKenrick, Judge.

Chiropractic school sought judicial review of civil rights commission's determination school had discriminated on the basis of disability. The district court reversed the decision of the civil rights commission. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Judith J. Morrell, Davenport, for appellant Davenport Civil Rights Commission.

Scott C. LaBarre and Susan Rockwood Kern of LaBarre Law Offices, P.C., Denver, Colorado, and Alan O. Olson of Olson Law Office, P.C., Des Moines, for appellant Aaron Cannon.

Robert D. Lambert of Stanley, Lande & Hunter, P.C., Davenport, for appellee.

Mary Kay Klimesh and Karen L. Stephenson of Seyfarth Shaw LLP, Chicago, Illinois, and Amanda G. Jansen of Ahlers & Cooney, P.C., Des Moines, for amicus curiae National University of Health Sciences.

Debra L. Hulett and Katie L. Graham of Nyemaster Goode, P.C., Des Moines, for amicus curiae Logan College of Chiropractic.

Meghan Sidhu, Baltimore, Maryland, and Alan O. Olson of Olson Law Office, Des Moines, for amicus curiae National Federation of the Blind.

Thomas G. Abram of Vedder Price, P.C., Chicago, Illinois, and Mark E. Weinhardt, William B. Ortman, and Donielle M. Shelton of Weinhardt & Logan, P.C., Des Moines, for amicus curiae National Board of Chiropractic Examiners.

**HECHT, Justice.**

A student requested a chiropractic school make accommodations for his visual disability. When the school denied the requested accommodations, the student filed a complaint with the civil rights commission in the community where the school is located. The commission found the school failed to comply with applicable federal and state disability laws and granted the student relief. The school sought judicial review, and the district court reversed the commission's ruling. Upon appellate review, we reverse the district court's ruling and remand to the district court for reinstatement of the commission's final agency action.

## I. Background Facts and Proceedings.

Palmer College of Chiropractic (Palmer) is a chiropractic school with campuses located in Iowa, Florida, and California. At its Davenport, Iowa location, Palmer administers bachelor of science and doctor of chiropractic programs. Aaron Cannon applied to Palmer's bachelor of science program at its Davenport, Iowa location, in the early spring of 2004.

Cannon had informed Palmer he was blind early in the application process. Palmer directed him to its contact person for students with disabilities, and Cannon met with the representative that spring. At that meeting, Cannon explained he had sometimes taken examinations with the assistance of a sighted reader in the past, he planned on completing the graduate program's undergraduate prerequisites and matriculating in the graduate program in March 2005, and he was in the process of registering and exploring additional accommodations for his blindness with the Iowa Department for the Blind (IDOB). The Palmer representative told Cannon she would discuss this information further

with key representatives of Palmer. She also revealed to Cannon, however, that Palmer had in the summer of 2002 adopted certain technical standards for admission to and graduation from its degree programs.

The technical standards adopted for each of Palmer's three campuses across the country require that degree candidates have "sufficient use of vision, hearing, and somatic sensation necessary to perform chiropractic and general physical examination, including the procedures of inspection, palpation, auscultations, and the review of radiographs as taught in the curriculum." Based on these standards, the Palmer representative explained, Cannon would find it difficult, if not impossible, to enter and complete Palmer's graduate program.

Despite the caution Palmer's representative expressed in the spring 2004 meeting, Cannon was admitted to Palmer's undergraduate program a few months later. He was also provisionally admitted to the graduate program, contingent on his successful completion of the required undergraduate coursework—without, apparently, any further inquiry as to if or how Cannon might satisfy Palmer's technical standards. Cannon enrolled in July 2004 and began coursework in the undergraduate program.

In August, shortly after enrolling, Cannon met again with Palmer's disability representative to discuss possible accommodations. The Palmer representative indicated she would arrange a meeting with Palmer's Disability Steering Committee in the next two weeks to further discuss possibilities. While waiting for that meeting to materialize, Cannon sent the Palmer representative an email detailing his skills and capabilities for dealing with certain visual challenges. He noted in the email his familiarity with various adaptive technologies, including

technologies for note taking and producing tactile versions of images and diagrams, and his history of success in previous classes having significant visual components. Two trimesters later, Cannon had successfully completed the graduate program's required undergraduate coursework, achieving a cumulative grade point average of 3.44 on a 4.0-point scale.[1]

As he neared completion of the undergraduate coursework, a meeting with Palmer's Disability Steering Committee was finally arranged in February 2005. Cannon reiterated his interest in preparing for and enrolling in the graduate program at the meeting. The steering committee again expressed doubt Cannon would be able to complete the program because Palmer's technical standards required sufficient use of vision. Cannon suggested several possible accommodations for the visual components of the curriculum, including a sighted reader and modifications of certain practical examinations, while acknowledging he could not yet anticipate each challenge that might present itself in the graduate program. The steering committee suggested these could not constitute acceptable accommodations for certain diagnostic portions of the curriculum and explained Cannon would therefore reach a "stoppage point," after which he would no longer be able to meet Palmer's requirements for advancement in the program. That point, the steering committee advised, would occur at the beginning of the fifth semester—the point at which students were slated to begin radiology and other diagnostic coursework. Cannon proposed that a sighted assistant might

---

[1]The record reveals Cannon's grade point average may have been negatively affected by the fact he missed his anatomy final in the winter of 2005 to be with his wife, who gave birth on the same day.

communicate to him the pertinent visual information in these courses enabling him to analyze it and to learn to make diagnoses accordingly.

The steering committee expressed doubt as to the feasibility of Cannon's proposed accommodation, suggesting it would place too much responsibility on the assistant. The committee thus repeated its position that the beginning of the fifth semester would constitute the stoppage point, but Cannon proposed they cross that bridge later after further investigation. Given the committee's apparent reliance on the recently adopted technical standards in concluding Cannon's proposed accommodations were unacceptable, Cannon asked about the purpose of the standards and whether they might be modifiable. The committee explained modification would compromise Palmer's compliance with standards promulgated by the Council on Chiropractic Education (CCE), the national accreditation body. The CCE standards, the committee explained, were "not negotiable."

Cannon was undeterred and enrolled in the graduate program, apparently without objection from Palmer, a few days later. Cannon believed with further investigation, he and Palmer could find an accommodation that would allow him to continue in the program and eventually graduate. Two weeks after his meeting with the steering committee, Cannon sent a letter to Palmer's president, expressing his frustration with the trajectory the meeting had taken. In the letter, Cannon noted he was aware of numerous blind individuals who had become successful chiropractors in the past, including at least two who had graduated from Palmer. In addition, Cannon explained IDOB had at its disposal "a wealth of information about strategies and techniques" for coping with some of the challenges Palmer foresaw and suggested Palmer

should consult with IDOB before rejecting out of hand his requests and suggestions for accommodation.

Palmer responded to Cannon's letter a month and a half later in mid-April. Palmer explained its adoption of technical standards was consistent with the purposes of the Americans with Disabilities Act (ADA) of 1990 and the earlier-existing Section 504 of the Rehabilitation Act (Rehabilitation Act). Those laws proscribed discrimination on the basis of disability, Palmer explained, but they did not require an institution to provide accommodations or curricular modifications if they would fundamentally alter the institution's educational program. The curricular modifications Palmer had granted to blind students in the past, Palmer explained, would not satisfy its current technical standards, and thus any similar modification now would constitute a fundamental alteration of its new program as defined by the technical standards. Nevertheless, Palmer explained, it would contact IDOB to inquire about other possible accommodations.

A month later, two Palmer representatives met with a representative from IDOB. Notes from the meeting indicate "no new information" was presented—Palmer explained its technical standards were necessary for accreditation and the accommodations proposed by Cannon would not satisfy these standards. The IDOB representative pointed out a blind individual had recently graduated from medical school in Wisconsin and the school had maintained its accreditation, but the Palmer representatives declined to explore further the investigation and accommodations the school had made. Instead, they stressed the importance of their own technical standards and their concern about the time, effort, and money Cannon had already expended and would continue to expend despite their indications he would be unable to

complete the program. Although the IDOB representative noted the meeting "concluded with no real progress made," the Palmer representatives stated they remained open to further guidance from the IDOB.

Cannon received a meeting report, summarizing the Palmer–IDOB conversation, from the IDOB representative shortly thereafter. Frustrated, and without any indication Palmer intended further investigation, Cannon filed a notice of withdrawal from the graduate program a few weeks later in early June 2005, before completing final coursework for his first trimester in the program. His grade report for the incomplete trimester indicated two grades of "C," five grades of "No Credit," and withdrawal from one class. Cannon later testified that prior to withdrawal, he had been confident he would receive strong grades for the term given his prior record at Palmer, but because he had withdrawn before final examinations and therefore missed and received no credit for them, he was left with the weak record on the report.[2]

Cannon filed a complaint with the Davenport Civil Rights Commission (commission) in July, contending Palmer had discriminated against him on the basis of his disability in violation of the Davenport Civil Rights Ordinance (DCRO), the Iowa Civil Rights Act (ICRA), and federal antidiscrimination laws. After reviewing the facts and applicable laws, the commission found probable cause existed to demonstrate discrimination, and the matter came before the commission for public hearing in February 2010. The two-day hearing featured testimony and exhibits from Cannon, Cannon's wife, three Palmer faculty members and

---

[2]The record reveals Cannon's withdrawal near the end of the trimester came too late for Cannon to receive grades of "Incomplete." He nevertheless chose to withdraw and miss his final examinations, which resulted in the grades of "C" and "No Credit."

officials, and a blind graduate of Palmer who now works as a chiropractor.

A few months after the hearing, the commission hearing officer issued a proposed order, finding Cannon had proved by a preponderance Palmer had discriminated on the basis of his blindness and granting proposed relief of damages equal to Cannon's previous cost of attendance, emotional distress damages, and attorney fees and costs. Cannon submitted exceptions to the proposed order, requesting readmission with reasonable accommodation and an order enjoining Palmer's strict application of its technical standards to blind individuals. Palmer submitted its own exceptions, requesting that the commission reject the proposed order in its entirety, dismiss the complaint, and assess costs to Cannon.

The parties addressed their exceptions at oral argument before the commission in August. After deliberations at its next two closed sessions, the commission issued a final order adopting the hearing officer's proposed conclusion that Cannon had proven disability discrimination by a preponderance of the evidence. The commission supplemented its final order with the injunctive readmission and accommodation Cannon had requested.

In support of its order, the commission set forth extensive findings of fact and conclusions of law. More specifically, the commission found Cannon was a person with a disability and "an otherwise qualified" student under the relevant federal, state, and municipal code provisions; he had requested specific accommodations for his blindness from Palmer on multiple occasions; and Palmer had denied these requests and failed to engage in the interactive investigative process required by federal and state disability law. Further, the commission found, Cannon's requested

accommodations would not fundamentally alter Palmer's curriculum, because Palmer had previously graduated blind students from its Iowa campus, Palmer's California campus already waived certain vision-specific competencies in its technical standards based on California antidiscrimination law, Palmer had presented no evidence its accreditation had been compromised by accommodations similar to those Cannon had requested or by the California competency waivers, and Palmer had presented no evidence state licensing boards would exclude blind individuals from practice. Based on these factual findings, the commission concluded Cannon was otherwise qualified to participate in Palmer's graduate program and was denied participation in the program on the basis of his disability. The commission therefore concluded Palmer's strict application of its technical standards to Cannon violated the DCRO, ICRA, and the ADA.

Palmer sought judicial review of the final order. The district court, explaining it was reviewing the commission's legal conclusions for errors of law and the commission's factual findings for substantial evidence, reversed the commission's order. Without explicitly suggesting the commission's factual findings were unsupported by substantial evidence, the district court determined the commission had failed, as a matter of law, to give appropriate deference to Palmer's identification of its curricular requirements, and therefore concluded substantial evidence supported Palmer's claims that Cannon's suggested accommodation was unreasonable and would constitute a fundamental alteration of the Palmer curriculum.

Cannon appealed the district court decision and we retained the appeal.

## II. Scope and Standards of Review.

Our general assembly has directed that final decisions of municipal civil rights commissions shall be reviewable to the same extent as final decisions of the Iowa Civil Rights Commission (ICRC). *See* Iowa Code § 216.19 (2013). We review decisions of the ICRC according to the standards delineated in Iowa's Administrative Procedure Act, set forth in chapter 17A of the Iowa Code. *Id.* § 216.17; *see Botsko v. Davenport Civil Rights Comm'n*, 774 N.W.2d 841, 844 (Iowa 2009). We are therefore bound by the commission's findings of fact if supported by substantial evidence. *Botsko*, 774 N.W.2d at 844; *see also* Iowa Code § 17A.19(10)(*f*). We will not, however, give deference to the commission's interpretation of provisions of law not vested in its discretion and will review those interpretations for legal errors. *See Rent-A-Ctr., Inc. v. Iowa Civil Rights Comm'n*, 843 N.W.2d 727, 730 (Iowa 2014); *Botsko*, 774 N.W.2d at 844; *see also* Iowa Code § 17A.19(10)(*c*). We apply the standards of chapter 17A on appeal to determine if our conclusions are the same as the district court's conclusions. *See Sunrise Ret. Cmty. v. Iowa Dep't of Human Servs.*, 833 N.W.2d 216, 219 (Iowa 2013).

## III. Discussion.

Section 216.9 of ICRA provides, in general terms, that "[i]t is an unfair or discriminatory practice for any educational institution to discriminate on the basis of . . . disability in any program or activity." Iowa Code § 216.9. The DCRO sets forth the same general language in extending its own protections against disability discrimination, to "provide for the execution within the city of the policies embodied in the Iowa Civil Rights Act of 1965 and" related federal civil rights laws. *See* Davenport, Iowa, Mun. Code § 2.58.010(B) (2013); *id.* § 2.58.125(A). Federal law extends its own disability discrimination protections in both

the ADA and Section 504 of the Rehabilitation Act. *See* Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101–12213 (2006); Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794.

We have often explained we will look to the ADA and cases interpreting its language, as well as cases interpreting the Rehabilitation Act, for guidance as we analyze disability discrimination claims brought under ICRA. *See, e.g., Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 329 (Iowa 1998). We have also explained we may look to the regulations underlying the federal acts in our analysis. *Id.* While these authorities are often persuasive, we note we are also guided by the breadth of the protections very clearly set forth in both ICRA and the DCRO. *See* Iowa Code § 216.18(1) ("This chapter shall be construed broadly to effectuate its purposes."); Davenport, Iowa, Mun. Code § 2.58.020 ("This chapter shall be construed broadly to effectuate its purpose.").

While ICRA and the DCRO set forth their protections in general terms, without language of limitation, the Rehabilitation Act and the ADA contain additional content in their statutory provisions. The ADA, applicable to all academic institutions receiving federal funding, provides that "no qualified individual with a disability shall, by reason of such disability . . . be denied the benefits of the . . . programs . . . of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act sets forth a similar standard, providing "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be denied the benefits of . . . any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Both the ADA and the Rehabilitation Act specifically prohibit discrimination against those with disabilities based not just on

"affirmative animus," but also any discrimination based on thoughtlessness, apathy, or stereotype.[3]  *See, e.g., Alexander v. Choate*, 469 U.S. 287, 295–97, 105 S. Ct. 712, 717–18, 83 L. Ed. 2d 661, 668–69 (1985).

In the context of higher education, Rehabilitation Act regulations explain a qualified individual is one "who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity."  34 C.F.R. § 104.3(l)(3) (2013). Educational institutions are required, however, to provide "such modifications . . . as are necessary" to aid individuals in meeting these academic and technical standards, to ensure requirements do not discriminate on the basis of disability.  *Id.* § 104.44(a).  The ADA incorporates a closely related accommodation requirement in defining a "qualified individual with a disability" as one "who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided."  42 U.S.C. § 12131(2).  Various courts have explained the ADA's "reasonable modification" requirement and the Rehabilitation Act's accommodation requirement impose coextensive

---

[3]The ADA goes further, defining discrimination in the context of public accommodation to include: (1) any use of criteria that unnecessarily "screen out" or "tend to screen out" individuals with disabilities; (2) failure to make nonfundamental, reasonable modifications of "policies, practices or procedures" when modification is necessary to accommodate those with disabilities; and (3) failure to take necessary steps "to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals."  42 U.S.C. § 12182(b)(2)(A) (defining "discrimination" under the ADA); *see also* 34 C.F.R. §§ 104.43—104.44 (2013) (implementing Section 504 of the Rehabilitation Act); 28 C.F.R. § 36.103 (explaining the ADA "shall not be construed to apply a lesser standard than the standard to be applied" under Section 504).

obligations, and the terms and standards may often be used interchangeably. *See, e.g., Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999).

Evaluating these statutory and regulatory standards in cases involving claims of disability discrimination in higher education, courts have required a claimant establish the following elements: (1) the claimant is a person with a disability under the relevant statute or statutes; (2) the claimant is qualified to participate in the program or, in other words, can meet the essential eligibility requirements of the program with or without reasonable accommodation; and (3) the claimant was denied the benefits of the program because of his or her disability.[4] *See, e.g., id.* at 816; *Ohio Civil Rights Comm'n v. Case W. Reserve Univ.*, 666 N.E.2d 1376, 1383 (Ohio 1996). We have previously adopted a substantially similar framework for analysis in the context of employment discrimination claims brought under ICRA and its federal analogues. *See, e.g., Boelman v. Manson State Bank*, 522 N.W.2d 73, 79 (Iowa 1994) (requiring discharge based on disability in place of denial of benefits based on disability). The parties have not suggested we apply a different framework for purposes of analyzing education discrimination claims brought under ICRA and the DCRO, and thus we apply our familiar disability discrimination framework to each of the claims at issue here. Further, because the parties do not dispute that Cannon is a person with a disability under each of the relevant statutes and do not seriously dispute that he was denied the benefits of the program because

---

[4]In analyzing claims brought under the ADA and Rehabilitation Act, courts have added a fourth element: evidence the institution receives federal financial assistance or is a public entity. *See, e.g., Wong*, 192 F.3d at 816. The parties concede here Palmer receives federal financial assistance for purposes of Cannon's federal claims and the federal assistance requirement is inapplicable to Cannon's state and municipal claims.

of his disability, we consider here only the question of whether Cannon was qualified to participate in the Palmer program with reasonable accommodation.[5]

1. *The meaning of "Qualified with Reasonable Accommodation."* As noted, the relevant federal acts and regulations define qualified individuals as those individuals who, with reasonable accommodation or "modification," can meet the "essential eligibility requirements"[6] of the institution. 42 U.S.C. § 12131(2).[7] In interpreting the meaning of reasonable accommodation, the United States Supreme Court has noted regulations implementing the Rehabilitation Act provide reasonable "[m]odifications may include changes in the length of time permitted for the completion of degree requirements, substitution of specific courses required for the completion of degree requirements, and adaptation of the

---

[5]Palmer notes other courts have sometimes expressed the "was denied the benefits of the program" element of the analysis as a requirement that a claimant has been "dismissed" from the program. *See, e.g., Wong*, 192 F.3d at 816. Because Cannon withdrew from the graduate program on his own, Palmer suggests he may not have met a "dismissal" requirement. We note, however, the relevant statutes here require only that a claimant be "denied the benefits" of the program for purposes of making out a claim. 42 U.S.C. § 12132; 29 U.S.C. § 794; Iowa Code § 216.9(1)(*a*); Davenport, Iowa, Mun. Code § 2.58.125(A)(1). Palmer concedes Cannon would have been denied the benefits of the program by the fifth trimester, if not earlier, based on his blindness, and thus we need not address the element further here.

[6]As noted, relevant Rehabilitation Act regulations set forth slightly different language in explaining a qualified individual may be required to "meet[] the academic and technical standards requisite to admission or participation in the recipient's education program or activity." 45 C.F.R. § 84.3(l)(3).

[7]We note the Rehabilitation Act adds the term "otherwise" in prohibiting discrimination against an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a). Numerous courts have explained despite this slight difference in terminology, the analyses of claims under both laws proceeds in much the same way. *See, e.g., Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 150 n.7 (2d Cir. 1999) (noting this linguistic difference between ADA and Rehabilitation Act); *Nelson v. Miller*, 170 F.3d 641, 649 (6th Cir. 1999) (noting analyses under the two provisions do not differ significantly). *See generally Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (1999) (collecting cases pointing out relationship between the ADA and Rehabilitation Act).

manner in which specific courses are conducted." *See Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 408 n.9, 99 S. Ct. 2361, 2368 n.9, 60 L. Ed. 2d 980, 990 n.9 (1979) (quoting 45 C.F.R. § 84.44); *see also* 29 C.F.R. § 1630.2(o)(2) (providing, in employment discrimination context, "[r]easonable accommodation may include but is not limited to: . . . acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities" (emphasis omitted)).

Further, the Supreme Court has noted, reasonable modifications in the form of "[a]uxiliary aids may include taped texts, interpreters or other effective methods . . ., readers in libraries for students with visual impairments, classroom equipment adapted for use by students with manual impairments, and other similar services and actions." *Davis*, 442 U.S. at 408 n.9, 99 S. Ct. at 2368 n.9, 60 L. Ed. 2d at 990 n.9 (quoting 45 C.F.R. § 84.44); *Nelson v. Thornburgh*, 567 F. Supp. 369, 380 (E.D. Pa. 1983) ("[T]he provision of readers is an express HHS example of reasonable accommodation." (Internal quotation marks and brackets omitted.)). Reasonable modification need not include, however, " 'devices or services of a personal nature.' "[8] *Davis,* 442 U.S. at 408 n.9, 99 S. Ct.

---

[8]Palmer suggests this "personal nature" principle might apply to Cannon given his status as the only student at Palmer currently requesting accommodation. We find the suggestion unpersuasive—we cannot conclude the implementing regulation in question simply absolves institutions of their obligation of accommodation in cases where requests are made by individuals, as opposed to groups of students. Instead, we believe the regulation indicates the "personal nature" principle is directed to services and devices dedicated exclusively to individuals—services that cannot, by their nature, typically also be used as accommodation by other individuals. *See* 34 C.F.R. § 104.44(d)(2). Palmer has not suggested Cannon's requests fit that latter description.

at 2368 n.9, 60 L. Ed. 2d at 990 n.9 (quoting 45 C.F.R. § 84.44). In addition, an accommodation may not be reasonable, the Supreme Court has explained, if it imposes "undue financial [or] administrative burdens" on the institution, or if it requires "a fundamental alteration in the nature of [the] program" offered. *Id.* at 410–12, 99 S. Ct. at 2369–70, 60 L. Ed. 2d at 990–92. Because the parties have not raised below or on appeal an issue of undue burden with respect to possible accommodations, and because Cannon's requests fit plausibly within the range of accommodations recognized as reasonable by courts and the ADA's implementing regulation, we consider here only the issue of whether accommodation would constitute a fundamental alteration of Palmer's program.

2. *The general contours of the fundamental alteration analysis.* In *Davis*, the Supreme Court encountered a case of a student with substantial hearing loss who sought nursing training at Southeastern Community College, in pursuit of her eventual goal of state nursing certification in North Carolina. *Id.* at 400, 99 S. Ct. at 2364, 60 L. Ed. 2d at 985–86. Upon learning of the student's hearing loss in the application process, Southeastern consulted its entire nursing faculty, an outside audiologist, and the director of the North Carolina nursing board, as part of its process of determining whether the student could be admitted to the Southeastern program and whether the student could later safely participate in Southeastern's clinical training program. *Id.* at 401–02, 99 S. Ct. at 2364–65, 60 L. Ed. 2d at 985–86. Based largely on the views of the nursing board director that the student had "hearing limitations which could interfere with her safely caring for patients," and limitations that could make it "impossible for [the student] to participate safely in the normal clinical training program," Southeastern denied the

student admission. *Id.* at 401–02, 99 S. Ct. at 2365, 60 L. Ed. 2d at 985–86.

Relying on those conclusions, the Supreme Court explained "Southeastern, with prudence, could [therefore] allow [the student] to take only academic classes." *Id.* at 409–10, 99 S. Ct. at 2369, 60 L. Ed. 2d at 990. Whatever benefits the student might have received from an academic course of study, the Court explained, "she would not receive even a rough equivalent of the training a nursing program normally gives." *Id.* at 410, 99 S. Ct. at 2369, 60 L. Ed. 2d at 990. That kind of modification, the Court concluded, would constitute a "fundamental alteration" of Southeastern's nursing program far greater than the reasonable "modification" required by federal laws and regulations. *Id.*

In reaching its conclusion on the fundamental alteration question thirty-five years ago, however, the Supreme Court explained the line between reasonable accommodation and fundamental alteration would not always be so neatly drawn in the future. *Id.* at 412, 99 S. Ct. at 2370, 60 L. Ed. 2d at 992. "It is possible to envision situations," the Court observed, "where an insistence on continuing past requirements and practices" may deprive "genuinely qualified" persons of opportunities for participation in educational programs. *Id.* Technological advances, the Court explained, should be expected to enhance and appropriately adapt opportunities for individuals with disabilities without undue burden, and refusals to modify programs accordingly may then constitute discrimination under the relevant laws. *Id.* at 412–13, 99 S. Ct. at 2370, 60 L. Ed. 2d at 992. Identification of instances where refusal to accommodate constitutes discrimination, the Court emphasized, would therefore remain an important and ongoing

responsibility of those tasked with implementation and application of our disability discrimination laws. *Id.*

Courts later applying the teachings of *Davis* have explained it "struck a balance" between the statutory rights ensuring those with disabilities "meaningful access" to the benefits offered by educational institutions, and "the legitimate interests" of those institutions "in preserving the integrity of their programs." *Alexander*, 469 U.S. at 300, 105 S. Ct. at 720, 83 L. Ed. 2d at 671; *Case W. Reserve Univ.*, 666 N.E.2d at 1384 (quoting *Alexander*). To strike that balance appropriately, the Supreme Court has observed, courts and educational institutions alike must take great care not to define the benefit or program "in a way that effectively denies otherwise qualified . . . individuals [with disabilities] the meaningful access to which they are entitled." *Alexander,* 469 U.S. at 301, 105 S. Ct. at 720, 83 L. Ed. 2d at 672.

Recognizing this fine line, lower courts have elucidated two principles in the fundamental alteration analysis that guide us in our inquiry here. First, courts have recognized that in considering the interests of educational institutions in the integrity of their programs, some deference to the institution's professional or academic judgment may often be appropriate. *See, e.g., Wong*, 192 F.3d at 817; *Wynne v. Tufts Univ. Sch. of Med.,* 932 F.2d 19, 25 (1st Cir. 1991). Second, however, whether and the extent to which that deference is appropriate depends heavily on the institution's satisfaction of several obligations. *See Wong*, 192 F.3d at 817–18; *Wynne*, 932 F.2d at 25–26. The institution, for example, has a "real obligation" to seek out "suitable means of reasonably accommodating" individuals with disabilities and to submit "a factual record indicating" it "conscientiously carried out this

statutory obligation." *Wynne*, 932 F.2d at 25–26; *see also Wong*, 192 F.3d at 818 ("Subsumed within this standard is the institution's duty to make itself aware of the nature of the student's disability [and] to explore alternatives for accommodating the student[.]"). That obligation requires an individualized and extensive inquiry—an institution must "carefully consider[] each disabled student's particular limitations and analyz[e] whether and how it might accommodate that student in a way that would allow the student to complete the school's program without lowering academic standards." *Wong*, 192 F.3d at 826; *see Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010) (" '[M]ere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; [the Rehabilitation Act] create[s] a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary.' " (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001))); *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988) ("[T]he determination of whether physical qualifications are essential functions of a job requires the [fact finder] to engage in a highly fact-specific inquiry. Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." (Citation omitted.)); *see also Sch. Bd. of Nassau Cnty. v. Arline,* 480 U.S. 273, 287, 107 S. Ct. 1123, 1130–31, 94 L. Ed. 2d 307, 320 ("[T]he [fact finder] will need to conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear . . . .").

Furthermore, institutions cannot merely look to "accepted academic norms," in exploring reasonable accommodations—because reasonable alternatives may often "involve new approaches or devices quite beyond 'accepted academic norms.' " *Wynne*, 932 F.2d at 26 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S. Ct 507, 513, 88 L. Ed. 2d 523, 532 (1985)); *cf. Strathie v. Dep't of Transp.*, 716 F.2d 227, 231 (3d Cir. 1983) (rejecting "broad judicial deference resembling that associated with the 'rational basis' test [which] would substantially undermine Congress' intent . . . that stereotypes or generalizations not deny handicapped individuals equal access to federally-funded programs" (footnote omitted)); *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1383 (10th Cir. 1981) ("[The Rehabilitation Act] provides that a recipient of federal financial assistance may not discriminate on the basis of handicap, regardless of whether there is a rational basis for so discriminating. The inquiry has to be on whether the University has, in fact, discriminated on the basis of handicap. The mere fact that the University acted in a rational manner is no defense to an act of discrimination.").

We require institutions to fulfill these obligations, courts have explained, because "courts still hold the final responsibility for enforcing the [disability discrimination laws] . . . [and w]e must ensure that educational institutions are not 'disguis[ing] truly discriminatory requirements' as academic decisions." *Wong*, 192 F.3d at 817 (quoting *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999)). Only if we determine an institution has satisfied its obligation of detailed, individualized inquiry is it appropriate to defer to the institution's judgment regarding the integrity of its program. *See Zukle*, 166 F.3d at 1048; *see also Wong*, 192 F.3d at 817–18; *Pandazides v. Va. Bd. of Educ.*,

946 F.2d 345, 349 (4th Cir. 1991) ("Accordingly, defendants cannot merely mechanically invoke any set of requirements and pronounce the handicapped applicant or prospective employee not otherwise qualified. The district court must look behind the qualifications. To do otherwise reduces the term 'otherwise qualified' and any arbitrary set of requirements to a tautology.").

3. *The appropriate level of deference here.* On appeal, Palmer contends the commission erred, as a matter of law, in failing to grant appropriate deference to Palmer's position regarding Cannon's ability to complete the graduate program without fundamental alteration, and relies on two distinct grounds.

First, Palmer relies on an earlier Iowa higher education case where we explained we " 'may not override' " an institution's professional judgment " 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' " *See North v. State*, 400 N.W.2d 566, 571 (Iowa 1987) (quoting *Ewing*, 474 U.S. at 225, 106 S. Ct. at 513, 88 L. Ed. 2d at 532). In *North*, however, we were not faced with claims of disability discrimination under the ADA or ICRA—instead, we considered breach of contract, tortious interference, and substantive due process and § 1983 civil rights claims. *See id.* at 568–71. We imported that principle of academic deference from a Supreme Court case that had also considered a due process claim, where the Court had no occasion to consider the level of deference to be accorded in discrimination cases and had taken pains to note it was not considering claims beyond those before it. *See Ewing*, 474 U.S. at 225, 106 S. Ct. at 513, 88 L. Ed. 2d at 532 ("It is important to remember that this is not a case in which the procedures used by the University were

unfair in any respect; quite the contrary is true. Nor can the Regents be accused of concealing nonacademic or constitutionally impermissible reasons for expelling Ewing[.]"); *North,* 400 N.W.2d at 571 (quoting *Ewing*). Given that context, we are unpersuaded by Palmer's reliance on *North* because, as numerous courts have explained, the application of deference based on "accepted academic norms" is inadequate in the disability discrimination context—courts must go significantly further in their inquiries to ensure inappropriate generalizations do not deny individuals meaningful access to the benefits provided by educational institutions. *Wynne,* 932 F.2d at 26 ("[*Ewing*] was a context where no federal statutory obligation impinged on the academic administrators; their freedom to make genuine academic decisions was untrammeled."); *Strathie,* 716 F.2d at 231; *Pushkin,* 658 F.2d at 1383; *see also Guckenberger v. Boston Univ.,* 8 F. Supp. 2d 82, 89 (D. Mass. 1998) (noting "a court should not determine that an academic decision is a 'substantial departure from accepted academic norms' simply by conducting a head-count of other universities"); Laura F. Rothstein, *Health Care Professionals with Mental and Physical Impairments: Developments in Disability Discrimination Law,* 41 St. Louis U. L.J. 973, 995 (1997) [hereinafter Rothstein] (observing New Jersey federal court "recognized the importance of individualized determinations" in holding state medical boards' use of physical and mental health inquiries "as a screening device" "were likely in violation of Title II of the ADA" and observing "these judges were affirming the principle that discrimination on the basis of disability cannot be justified by generalizations about such disabilities").

Perhaps just as importantly for purposes of our analysis here, the Supreme Court in *Ewing* explained it was granting deference there *only*

*after* noting "the faculty's decision was made conscientiously and with careful deliberation, based on an evaluation of the entirety of Ewing's academic career." *Ewing*, 474 U.S. at 225, 106 S. Ct. at 513, 88 L. Ed. 2d at 532. To the extent the *Ewing* deference analysis may inform our analysis in the context of disability discrimination, then, we note the *Ewing* court's emphasis on the extensive individualized investigation suggests, much like courts actually considering disability discrimination claims have, application of any deference may only be appropriate after an institution has established it has fulfilled its obligations of conscientious inquiry. *Id.*; *see also* Edward N. Stoner II & J. Michael Showalter, *Judicial Deference to Educational Judgment: Justice O'Connor's Opinion in* Grutter *Reapplies Longstanding Principles, As Shown by Rulings Involving College Students in the Eighteen Months Before* Grutter, 30 J.C. & U.L. 583, 611 (2004) (noting one principle "underlying judicial deference in ADA cases involving students is that persons trained to have educational judgment are not necessarily experts in disability accommodations").

Palmer's second ground for its contention the commission erred in failing to extend appropriate deference—namely, that Palmer fulfilled its obligation of extensive individualized inquiry before denying Cannon the opportunity to participate in its program—is no more persuasive. Palmer advances a two-pronged exposition of its investigation with respect to Cannon. First, Palmer recounts the numerous discussions its faculty had in developing the technical standards it seeks to apply here, points to the evidence it presented below supporting its initial creation and adoption of the standards, and notes the "standards are based upon [Palmer's] teaching experiences with disabled students including those visually impaired." Second, Palmer explains the "technical standards are

applied on a case-by-case basis depending upon whether or not the disabled individual meets those standards." Based on this exposition, we cannot conclude the commission's findings regarding Palmer's approach were unsupported by substantial evidence or that the commission erred in determining Palmer failed to advance evidence of an inquiry resembling anything like the fact-specific, individualized inquiry required by the caselaw.

On the first point, Palmer appears to concede it seeks to invoke its standards in Cannon's case as an "essential requirement" based on no investigation at all of Cannon's condition or ability to perform with a reader or the various technologies he noted he had or could have at his disposal. Instead, Palmer would invoke the standards based on its experiences with past individuals with disabilities. That strict, generalized invocation of Palmer's technical standard falls far short, we think, of the conscientious, interactive, student-specific inquiry required by the caselaw. *See, e.g.*, *Wong*, 192 F.3d at 819 ("Dean Lewis failed to discuss Wong's proposal with any of the professionals who had worked with Wong to pinpoint his disability and help him develop skills to cope with it."); Laura Rothstein, *Disability Law and Higher Education: A Road Map for Where We've Been and Where We May Be Heading*, 63 Md. L. Rev. 122, 142 (2004) ("In determining that it would not be a substantial alteration to accommodate Casey Martin by allowing the use of a golf cart in professional golf tournament play, the [Supreme Court] emphasized the importance of an individualized assessment. The Court noted that for Martin the use of a cart was not a fundamental alteration because the essential aspect of fatigue was still present for him. The Court added that other requests for golf carts would have to be individually assessed to ensure that others would not be unfairly advantaged."); *see also*

*D'Amico v. N.Y. State Bd. of Law Exam'rs*, 813 F. Supp. 217, 223 (W.D.N.Y. 1993) ("The Board's opinion as to what is 'reasonable' for a particular applicant can be given very little weight when the Board has no knowledge of the disability or disease, no expertise in its treatment, and no ability to make determinations about the physical capabilities of one afflicted with the disability or disease.").

Palmer fares no better on the second point—it invokes the phrase "case-by-case basis," but then concedes it applies its technical standards depending solely on whether the individual meets the standards. *See Case W. Reserve Univ.*, 666 N.E.2d at 1391 (Resnick, J., dissenting) ("[B]lanket requirements are not *ipso facto* bona fide. CWRU cannot exclude all blind medical school applicants without first investigating and considering reasonable accommodations . . . any more than it can exclude an individual applicant without conducting such an investigation."); Rothstein, 41 St. Louis U. L.J. at 994 ("One theme that is consistent in virtually all disability discrimination decisions, even those involving academic institutions or health care professions, is that an assessment about whether a particular individual is otherwise qualified should be made on an individualized basis. Courts have usually been wary of generalized determinations that a particular condition renders all persons with that impairment unqualified to carry out a particular job."). If there is an inquiry hidden in that apparent tautology as to how or whether the standards might be modified in any individual case, or more importantly, an indication as to the way the inquiry was made for Cannon, we cannot discern it. Palmer's generalized application did little to satisfy its obligation of individualized investigation here.[9] *See, e.g.,*

---

[9]We think it important to emphasize here Palmer's apparent concession that provision of Cannon's requested accommodations would not fundamentally alter its

*Wynne*, 932 F.2d at 26 (explaining institution must seek means of reasonably accommodating individual and "[i]f the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means . . . the court could rule as a matter of law that the institution had met its duty"); *see also Pandazides*, 946 F.2d at 349 ("The district court must look behind the qualifications. To do otherwise reduces the term 'otherwise qualified' and any arbitrary set of requirements to a tautology."); *Bentivegna v. U.S. Dep't of Labor*, 694 F.2d 619, 621 (9th Cir. 1982) ("[*Davis*] cannot mean [an institution] can discriminate by establishing restrictive 'program requirements' where it could not so discriminate in making individual employment decisions.").

Turning to the commission's analysis of the deference question, we note the commission set forth extensive factual findings bolstering its conclusion Palmer failed to satisfy its investigative obligation. More specifically, the commission offered substantial evidence in support of the following findings: Palmer engaged in minimal interaction with Cannon; Palmer failed to investigate, with or without Cannon, how he might actually use a reader given a specific task; Palmer failed to

---

curriculum until the fifth trimester may constitute probative evidence of the reasonableness of duties to both provide and specifically investigate these accommodations in the preceding trimesters. *See, e.g., Lane v. Pena*, 867 F. Supp. 1050, 1070 (D.D.C. 1994) ("Moreover, the Defendants admit that such requirements, if any, do not even apply to students such as Lane who have not yet reached their third year. Consequently, the Defendants cannot simply point to that statute and definitively conclude that maintaining eligibility for such a commission is an essential requirement to remaining at the USMMA and that, therefore, their actions were consistent with Section 504."), *vacated in part on other grounds*, 518 U.S. 187, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996); Alicia Ouellette, *Patients to Peers: Barriers and Opportunities for Doctors with Disabilities*, 13 Nev. L.J. 645, 666 (2013) ("The available evidence indicates that medical schools graduate more medical students with sensory and motor disabilities than they admit, suggesting that they make accommodations for students who develop specific disabilities after they have started their course of study.").

investigate with the requisite depth how other former blind students had performed specific tasks in the past; Palmer failed to investigate reports of successful blind students at other schools and successful blind chiropractic practitioners; Palmer failed to investigate reports of technologies used successfully elsewhere in school and professional settings; and Palmer failed to engage individuals with experience teaching Cannon or other blind individuals, among other failures. Given those findings, and given the principle from the relevant caselaw that an institution's academic judgments are owed minimal, if any, deference in the absence of a showing the institution has fulfilled its investigative obligations, we cannot conclude the commission has erroneously interpreted the applicable law on deference here. *See* Iowa Code § 17A.19(10)(*c*); *Wong*, 192 F.3d at 818 ("We do not defer to the academic institution's decision in the present case because the record that the University presented falls short of [the requirement of in-depth, individual analysis].").

4. *The commission's fundamental alteration analysis: specific fundamental alteration principles and their application here.* Because Palmer has failed to establish it met the legal prerequisites for deference to its determination accommodation would constitute fundamental alteration here, we turn to the commission's analysis of the fundamental alteration inquiry. *Cf. Wong*, 192 F.3d at 819–20 (noting, in different appellate posture, court would "not defer to the institution's decision"— instead, it would "examine the rejection of Wong's request for an eight-week reading period de novo").

At the outset, we note numerous courts have explained determinations of reasonable accommodation and fundamental alteration within the meaning of the ADA generally require flexible, fact-specific

inquiries and are typically resolved as questions of fact. *See, e.g., Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998) ("The reasonableness of a requested accommodation is a question of fact."); *Long v. Howard Univ.*, 439 F. Supp. 2d 68, 80 (D.D.C. 2006) ("Based on the evidence proffered by the parties thus far, whether the modifications would in fact constitute a fundamental alteration is a question requiring jury resolution."); *see also Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) ("Although neither the ADA nor the courts have defined the precise contours of the test for reasonableness, it is clear that the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."); *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996) ("[W]e have held that the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry."); *Zimple v. Hancock Fabrics, Inc.*, 2013 WL 4069553, *3 (N.D. Iowa 2013) (denying summary judgment on fundamental alteration question and noting "there are many questions of fact in the record on just what th[e] essential functions [of the job] were"); *Powers v. MJB Acquisition Corp.*, 993 F. Supp. 861 (D. Wyo. 1998) ("[C]ourts that have considered the issue in any depth have generally followed . . . a fact-specific, case-by-case inquiry. . . . Regardless of how the standard is phrased, one thing is clear: in most circumstances, the determination of what constitutes a reasonable modification or accommodation is a fact-intensive question ill-suited for resolution at the summary judgment stage." (quoting *Staron*, 51 F.3d at 356)); *Boelman*, 522 N.W.2d at 80 (explaining fact finder must answer question of whether claimant "could

perform the essential functions of the job" and, if not, whether any reasonable accommodation would enable performance); *cf.* Kerri Lynn Stone, *The Politics of Deference and Inclusion: Toward a Uniform Framework for the Analysis of "Fundamental Alteration" Under the ADA*, 58 Hastings L.J. 1241, 1270 (2007) ("Although the ultimate question [of fundamental alteration] is quite fact-driven and circumstance-specific, courts have no guidelines as to the scope of the considerations they ought to look at regarding the facts and the law surrounding this most philosophical question . . . ."). *But see* Sande L. Buhai, *Practice Makes Perfect: Reasonable Accommodation of Law Students with Disabilities in Clinical Placements*, 36 San Diego L. Rev. 137, 146 (1999) ("In determining whether a function is essential, courts must address each case individually. Whether the plaintiff can perform the essential job functions with reasonable accommodations is a mixed question of law and fact, which involves primarily a factual inquiry.").

Before examining the commission's findings regarding fundamental alteration, however, we think it prudent to note several principles courts and commentators have developed to aid the fact finder in determining whether an accommodation is reasonable or might constitute a fundamental alteration in a given case. *See Easley by Easley v. Snider*, 36 F.3d 297, 302 (3d Cir. 1994) (noting courts "cannot rely" on institution's characterization of its program, because the institution "may attempt to define the benefit in a way that 'effectively denies otherwise handicapped individuals the meaningful access to which they are entitled' " (quoting *Alexander*, 469 U.S. at 301, 105 S. Ct. at 720, 83 L. Ed. 2d at 672)). Courts considering education discrimination claims have often looked to fundamental alteration considerations from the employment context for guidance. *See, e.g., Wong*, 192 F.3d at 820–21.

Implementing regulations for the ADA's employment provision suggest courts consider several factors in determining whether particular duties constitute fundamental or essential functions of the job. *See* 29 C.F.R. § 1630.2(n)(3); *see also Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 787 (8th Cir. 1998). Those factors include, among others: job descriptions prepared for advertising or used when interviewing applicants for the job; the amount of time spent on the job performing the function in question; consequences of not requiring the person to perform the function; the work experience of persons who have held the job; and/or the current work experience of persons in similar jobs. 29 C.F.R. § 1630.2(n); *see also* Rothstein*,* 41 St. Louis U. L.J. at 976–77 ("The function may be essential because that function is the purpose of the position, because there are a limited number of employees among whom the function can be distributed, or because the function is highly specialized and the individual was hired specifically because of his or her expertise in that specialty.").

Applying these "essential functions" principles from employment cases, numerous courts in the education context have found the fact that institutions have previously granted accommodations the same as or similar to the accommodation at issue persuasive evidence the accommodation is reasonable and does not fundamentally alter the institution's curriculum. *See, e.g., Wong*, 192 F.3d at 820 ("The fact that the school previously made the exact modification . . . that Wong requested . . . is certainly persuasive evidence from which a [fact finder] could conclude that the accommodation was reasonable."); *Zukle,* 166 F.3d at 1048–49 (considering student's request for eight weeks off between medical school rotations and noting institution's previous decisions to grant requests for decelerated schedule were probative of

reasonableness); *Matthews v. NCAA*, 179 F. Supp. 2d 1209, 1226–27 (E.D. Wash. 2001) ("Most notably, the NCAA already has granted Plaintiff two waivers, including one waiver of [its rule requiring student-athletes to earn seventy-five percent of their annual credit hours during the regular academic year]. The Court finds it difficult, particularly in light of the individualized inquiry required by [*PGA Tour, Inc. v.*] *Martin*, [532 U.S. 661, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001),] to see how granting a third waiver to Plaintiff would fundamentally alter the NCAA's purpose, when the first two waivers did not."); *see also Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1234 (S.D. Fla. 2010) (explaining school could not invoke "across-the-board" GPA requirement as basis for dismissal and noting court could not "ignore the fact that [school dean] did provide accommodations, and with them Forbes earned a [satisfactory GPA]."). In so doing, these courts have applied the general principle from the ADA caselaw that an institution will bear a "particularly heavy" burden in establishing an accommodation is unreasonable where other institutions have provided accommodation for the same deficit without significant issue. *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1272 (D.C. Cir. 2008) ("[B]ecause other currency systems accommodate the needs of the visually impaired, the [Secretary of the Treasury's] burden in demonstrating that implementing an accommodation would be unduly burdensome is particularly heavy."); *see also Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1084–85 (N.D. Cal. 2013) ("Tamara has provided the service animal policies for a number of stand-alone psychiatric hospitals and individual wards within general hospitals, whose policies allow for the admittance of service dogs. . . . In light of the broad allowance for service animals, El Camino has not met its burden to show that the presence of service dogs within the

psychiatric ward is likely to fundamentally alter the nature of the facility nor has it sufficiently established that it conducted an intensive fact-based inquiry." (Citations omitted.)).

Similarly, courts have considered the current and past job experiences of those with the same disability in considering whether modification might fundamentally alter a professional curriculum. *See, e.g., Lane v. Pena,* 867 F. Supp. 1050, 1070 (D.D.C. 1994) ("[G]iven that many people with diabetes have obtained merchant marine licenses, and at least 50 people with diabetes mellitus are currently operating under a merchant marine license at sea, the Court finds that the rigid naval reserve requirements are not 'essential' to at least one purpose of the program, namely, training officers for the merchant marine."), *vacated in part on other grounds,* 518 U.S. 187, 116 S. Ct. 2092, 135 L. Ed. 2d 486 (1996). Courts have also looked to an individual's past academic success and considered whether later professional licensure actually requires performance of the institution's proposed function. *Shaywitz v. Am. Bd. of Psychiatry & Neurology,* 675 F. Supp. 2d 376, 390–91 (S.D.N.Y. 2009) ("Given Shaywitz's alleged competence and success as a medical student, resident, and fellow, and that the Board has largely eliminated its Part II Oral Exam, the Court finds it plausible that certifying Shaywitz without his having to pass the live-patient portion of the Part II Oral Exam, based on the facts as alleged at the pleading stage, would not 'fundamentally alter the nature of' the Board-certification process." (Internal citations omitted.)).

With those propositions in mind, we turn to the commission's findings with respect to fundamental alteration. We note we are concerned on appeal with two principles regarding the commission's findings. First, in reviewing the commission's factual findings we must

determine merely whether the evidence "supports the findings actually made" by the commission and need not concern ourselves with whether the evidence might also support a different finding. *See Meyer v. IBP, Inc.,* 710 N.W.2d 213, 218 (Iowa 2006). Second, in reviewing the commission's application of the law to the facts, we may look to other grounds of error, such as erroneous interpretation of law, irrational reasoning, or failure to consider relevant facts, in determining whether the commission has abused its discretion in its application. *Id.* at 218–19.

As noted above, the commission made several noteworthy findings in support of its determination Cannon's proposed accommodation was reasonable. First, the commission found the record revealed no evidence state licensing boards required sight, or interpretation of radiographic images in precisely the manner required by Palmer, for purposes of licensure. Second, Palmer presented no evidence the course modifications and waivers it grants at its California campus have jeopardized its accreditation with national accrediting bodies. Third, at least two blind students had graduated previously from Palmer's Davenport campus and are currently licensed and practicing successfully.

Palmer asserts, however, that it cannot accommodate Cannon, and the commission's decision must therefore be reversed as a matter of law, because all chiropractic students must be able to see radiographic images. We find this contention unpersuasive. Palmer itself concedes at least twenty percent of current chiropractic practitioners practice without "the ability to take plain film radiographs in their office[]," and concedes the size of the fraction is currently on the rise. These concessions are at odds with the contention radiographic image interpretation—regardless

whether in the narrow sense Palmer has defined it or even the more general sense of having the equipment available—must constitute an "essential" component of the education or practice of chiropractic. Furthermore, as Palmer has noted, frequent consultation between chiropractors and radiology specialists is "oftentimes" "part of the clinical practice [of chiropractic]."

We also find it instructive that numerous medical schools, ostensibly recognizing these realities, have admitted blind students and made accommodation in recent years. *See, e.g.*, Sarah M. Eickmeyer et al., *North American Medical Schools' Experience with and Approaches to the Needs of Students with Physical and Sensory Disabilities*, 87 Acad. Med. 567, 569–70 (2012) (finding at least sixty partially- or totally-blind students matriculated at U.S. medical schools between 2001 and 2010 and noting schools have provided accommodations ranging from "[an] assistant for observation" to "[an] assistant for physical exam[ination]"). The accommodations made by these schools, coupled with Palmer's own previous accommodations, weigh particularly heavily against Palmer's fundamental alteration defense. *See Am. Council of the Blind*, 525 F.3d at 1272; *Tamara*, 964 F. Supp. 2d at 1084–85. Recent proposed rulemaking by the Department of Justice bolsters this position, as it seeks "to ensure that medical diagnostic equipment, including examination tables, examination chairs, . . . and other imaging equipment used by health care providers for diagnostic purposes are accessible to and usable by individuals with disabilities." *Medical Diagnostic Equipment Accessibility Standards*, 77 Fed. Reg. 6916, 6916 (proposed Feb. 9, 2012) (to be codified at 36 C.F.R. pt. 1195); *see also* Alicia Ouellette, *Patients to Peers: Barriers and Opportunities for Doctors*

*with Disabilities*, 13 Nev. L.J. 645, 661 (2013) ("Congress also included incentives in the Affordable Care Act for accessibility.").

We conclude substantial evidence supports each of the commission's findings.[10]  Furthermore, given the widespread recognition that the fundamental alteration inquiry is fact-intensive and typically to be resolved as a question of fact, given the recognition in the caselaw that each of the factors considered by the commission may constitute persuasive evidence on the issue of reasonable accommodation, and given the high burden courts have imposed where the same institution or other institutions have made reasonable accommodation for the same deficit, we cannot conclude the commission has erroneously interpreted or irrationally applied the applicable law in concluding Palmer failed to

---

[10]Despite Palmer's representations to the contrary, the medical literature also provides substantial support for the proposition that accommodation of individuals with sensory and physical deficits need not fundamentally alter the provision of medical education.  *See, e.g.*, Sarah M. Eickmeyer et al., *North American Medical Schools' Experience with and Approaches to the Needs of Students with Physical and Sensory Disabilities*, 87 Acad. Med. 567, 568–70 (2012) (emphasizing the substantial number of blind students accommodated at medical schools in recent years and explaining "[m]any have questioned the emphasis placed on specific physical and sensory capabilities in defining the technical skills required by medical schools"); Michael J. Reichgott, *The Disabled Student as Undifferentiated Graduate: A Medical School Challenge*, 279 JAMA 79, 79 (1998) ("In this era of technologic diagnostics and professional assistants, the 'essential functions' of medical education might be restated as acquiring fundamental knowledge; developing communication skills; interpreting data; integrating knowledge to establish clinical judgment; and developing appropriate professional attitudes and behaviors."); *see also* Joel A. DeLisa & Peter Thomas, *Physicians with Disabilities and the Physician Workforce: A Need to Reassess Our Policies*, 84 Am. J. Physical Med. & Rehabilitation 5, 6 (2005) ("Healthcare professionals adequately trained for the future will need to know what informational resources to use; how to gather necessary data; how to integrate complex information, make diagnoses, and develop treatment plans; and how to effectively use changing technological resources, work with teams, and communicate with diverse populations.  These skills are largely cognitive and not physical, raising questions about the adequacy of the current approach to medical training."); *cf.* Demetrius Moutsiakis & Thomas Polisoto, *Reassessing Physical Disability Among Graduating US Medical Students*, 89 Am. J. Physical Med. & Rehabilitation 923, 926–27 (2010) (noting trend of steadily declining medical school graduation rates over the last four decades for individuals with physical and sensory disabilities and recommending schools "remove the requirement of the undifferentiated graduate to allow [individuals] with, for example, blindness to train in other capacities such as preventive medicine and public health").

establish provision of Cannon's requested accommodations would constitute fundamental alteration of its curriculum on these facts. *See* Iowa Code § 17A.19(10)(*c*), (*f*), (*i*), (*j*), (*l*).

### IV. Conclusion.

We conclude substantial evidence supports the commission's factual findings and the commission has not erred in interpreting the relevant laws or applying them to the facts at issue here. We therefore reverse the decision of the district court and remand the case to the district court with instructions to affirm the commission's order.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

All justices concur except Waterman and Mansfield, JJ., who dissent.

**WATERMAN, Justice (dissenting).**

I respectfully dissent. The majority elevates political correctness over common sense. Obscured in its lengthy decision is the fact our court and the Davenport Civil Rights Commission are requiring Palmer College of Chiropractic to permit a student, blind since birth, to interpret X-rays based on what an untrained reader tells him the X-ray films depict and treat patients through vigorous spinal adjustments relying on that interpretation. Aaron Cannon failed to prove such an accommodation is reasonable. As the district court recognized, "vision is indispensable for several critical functions that chiropractic students and professionals must perform, such as reviewing X-rays, analyzing radiographs, and assessing physical symptoms." I defer to no one in my admiration for Cannon and his blind attorney and the challenges they both have overcome, but there is a point at which an accommodation ceases to be reasonable, and it has been met here.

What is next? Are we going to require the Federal Aviation Administration to hire blind air traffic controllers, relying on assistants to tell them what is appearing on the screen? The principle is the same here. A misinterpreted X-ray could lead to improper treatment and lifelong paralysis. X-ray interpretation requires training and skilled judgment to reach correct conclusions based on shades and shadows of complex bony structures. That is why many physicians with twenty–twenty vision choose to outsource interpretation of X-rays to radiologists. It is ludicrous to override Palmer's academic decision and require it to permit a blind person to interpret X-rays for patient treatment based on what someone else claims he or she is seeing.

The majority's intrusion into academic judgment on professional health care standards is unprecedented. No other court in the country has forced an academic institution to allow a blind student to interpret X-rays relying on an untrained sighted assistant. The majority fails to confront the well-reasoned decision of the Ohio Supreme Court applying the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701–797b, to uphold a medical school's decision to deny admission to a blind student who, like Cannon, requested a personal assistant to read X-rays and help with clinical examinations. *Ohio Civil Rights Comm'n v. Case W. Reserve Univ.*, 666 N.E.2d 1376, 1383, 1386 (Ohio 1996). The district court correctly followed *Case Western Reserve University* in concluding such an accommodation was unreasonable and would fundamentally alter Palmer's program. I would affirm. Our court and the local commission comprised of laypersons have no business second-guessing the professional academic judgment of our nation's leading college of chiropractic. Palmer has reasonably concluded that its graduates personally must be able to see and interpret X-rays. A student who has never seen a spine cannot reliably interpret spinal X-rays based on what someone else tells him the films show.

I would follow the Ohio Supreme Court's reasoning in *Case Western*, the facts of which are strikingly similar to this case. A blind student, Cheryl Fischer, applied to medical school at Case Western Reserve University. *Id.* at 1379. To evaluate applicants, Case Western applied technical standards promulgated by the Association of American Medical Colleges (AAMC), which required that candidates must be able to "observe a patient accurately at a distance and close at hand." *Id.* at 1379–80. The AAMC technical standards explained, "The use of a trained intermediary means that a candidate's judgment must be

mediated by someone else's power of selection and observation." *Id.* at 1380. Case Western "concluded that a blind student would be unable to complete the requirements of the medical school program." *Id.* An associate professor of surgery at Case Western emphasized that "Fischer would be unable to exercise independent judgment when reading an X-ray, unable to start an I.V., and unable to effectively participate in the surgery clerkship." *Id.* (noting further that Fischer would be unable to "identify tissue and organ structures through a microscope" or "observe how such structures are affected by disease"). "In the[] medical educators' opinions, the use of an intermediary would interfere with the student's exercise of independent judgment—a crucial part of developing diagnostic skills." *Id.* at 1387.

The Ohio Supreme Court deferred to Case Western's academic judgment, as we should defer to Palmer's. The Ohio Supreme Court emphasized that an educational institution is in the best position to determine whether a student will be able to successfully complete the program:

> [Case Western]'s decision not to modify its program by waiving course requirements or permitting intermediaries to read X-rays or perform physical examinations is an academic decision. Courts are particularly ill-equipped to evaluate academic requirements of educational institutions. As a result, considerable judicial deference must be paid to academic decisions made by the institution itself unless it is shown that the standards serve no purpose other than to deny an education to the handicapped.

*Id.* at 1386 (citations omitted). Deferring to the AAMC technical standards and the medical educators' opinions, the court acknowledged that waiving the requirement to read an X-ray—or using an intermediary to perform that function—would fundamentally alter the nature of Case Western's program. *Id.* at 1387; *see also Cunningham v. Univ. of N.M. Bd.*

*of Regents,* 531 F. App'x 909, 919–20 (10th Cir. 2013) (affirming dismissal of vision-related disability claims by medical student, noting "[t]o the extent [the plaintiff] avers UNM should have changed its program requirements, such an accommodation would not be reasonable"). The *Case Western* court further recognized that providing a blind student additional supervision and waiving courses for the student is not required under the United States Supreme Court's decision in *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S. Ct. 2361, 2369, 60 L. Ed. 2d 980, 990 (1979), when such accommodations would not change the fact that the student will be unable to satisfy the degree requirements. *Case W. Reserve Univ.,* 666 N.E.2d at 1386–87.

Our case is also analogous to *Davis.* In *Davis,* the United States Supreme Court upheld a nursing college's decision to deny admission to an applicant with a hearing disability, holding the law "does not encompass the kind of curricular changes that would be necessary to accommodate [the applicant] in the nursing program." *Davis,* 442 U.S. at 409, 99 S. Ct. at 2369, 60 L. Ed. 2d at 990. Similarly to the nursing applicant, Cannon "would not receive even a rough equivalent of the training" Palmer normally gives. *Id.* at 410, 99 S. Ct. at 2369, 60 L. Ed. 2d at 990. "Such a fundamental alteration in the nature of a program is far more than the 'modification' the regulation requires." *Id.* Like the proposed accommodations for the deaf applicant in *Davis,* it appears unlikely "Cannon could benefit from any affirmative action that the regulation reasonably could be interpreted as requiring." *Id.* at 409, 99 S. Ct. at 2368, 60 L. Ed. 2d at 990. Therefore, Palmer, "with prudence," could not allow Cannon to graduate from the program. *Id.* at 409, 99 S. Ct. at 2369, 60 L. Ed. 2d at 990.

As the majority notes, many practicing chiropractors lack X-ray equipment and rely on other professional radiologists or chiropractors to interpret their patients' X-rays. Cannon, however, is not asking for a waiver to allow him to rely on the interpretation of a qualified expert. Rather, his requested accommodation is to interpret X-rays himself, based on what an untrained sighted assistant tells him. In any event, the law does not obligate Palmer to waive program requirements. The plaintiff in *Case Western* argued the school should waive certain medical-school skill requirements because she planned to pursue a practice in psychiatry, in which those skills were unnecessary. 666 N.E.2d at 1386. The Ohio Supreme Court rejected this argument, stating:

> The goal of medical schools is not to produce specialized degrees but rather general degrees in medicine which signify that the holder is a physician prepared for further training in any area of medicine. As such, graduates must have the knowledge and skills to function in a broad variety of clinical situations and to render a wide spectrum of patient care. All students, regardless of whether they intend to practice in psychiatry or radiology, are required to complete a variety of course requirements, including rotations in pediatrics, gynecology, and surgery.

*Id.* at 1387. In the same way, it is Palmer's prerogative to decide the skills necessary to graduate with a chiropractic degree. A student's choice to focus his or her practice on certain skills to the exclusion of others does not exempt that student from successfully completing degree requirements.

The majority recognizes that it is appropriate to give deference to an institution's professional or academic judgment, yet refuses to defer to Palmer because the commission concluded Palmer did not seek out "suitable means of reasonably accommodating" individuals with disabilities. I disagree that Palmer's investigation fell short. Palmer met with Cannon multiple times, met Iowa Department of the Blind

representatives, and expressed a willingness to continue the dialogue. Nothing in the record supports a conclusion that further investigation by Palmer would have found a way for Cannon to personally see and interpret X-rays. Technological advancements may one day allow blind individuals to interpret X-rays. No such "app" exists today. Cannon simply has not satisfied his burden to prove a reasonable accommodation is possible regarding X-ray interpretation. *See Boelman v. Manson State Bank*, 522 N.W.2d 73, 80 (Iowa 1994) ("[T]he plaintiff must produce enough evidence to make a facial showing that reasonable accommodation is possible."). The majority would require Palmer to jump through additional hoops to establish what the record already makes clear—Cannon cannot satisfy the chiropractic program requirement that students master X-ray interpretation.

We should defer to Palmer's conclusion that accommodating Cannon would fundamentally alter its chiropractic program. In *North v. State*, we recognized " '[c]onsiderations of profound importance counsel restrained judicial review of the substance of academic decisions.' " 400 N.W.2d 566, 571 (Iowa 1987) (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513, 88 L. Ed. 2d 523, 532 (1985)). Though *North* did not involve a claim under the ADA, the principle of deference expressed in that opinion is a truism with broad application. When presented with ADA claims, courts "have overwhelmingly extended some level of deference to schools' professional judgments regarding students' qualifications when addressing disability discrimination claims." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 463 (4th Cir. 2012) (collecting cases and noting, "[b]ecause we are . . . at a comparative disadvantage in determining whether Halpern is qualified to continue in the Doctor of Medicine program and whether his proposed

accommodations would effect substantial modifications to the Medical School's program, we accord great respect to Wake Forest's professional judgments on these issues"). I would follow the United States Supreme Court's guidance: "When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment." *Ewing*, 474 U.S. at 225, 106 S. Ct. at 513, 88 L. Ed. 2d at 532.

The majority relies on *Wong v. Regents of University of California*, 192 F.3d 807 (9th Cir. 1999), and *Wynne v. Tufts University School of Medicine* (*Wynne I*), 932 F.2d 19 (1st Cir. 1991), but the standards elucidated in those cases favor Palmer. The Court of Appeals for the Ninth Circuit recognized in *Wong* that:

> Faculty members and administrators of a professional school are unquestionably in the best position to set standards for the institution and to establish curricular requirements that fulfill the school's purpose of training students for the work that lies ahead of them.

192 F.3d at 825–26. The court noted deference to an academic institution is inappropriate only if the institution has not "carefully consider[ed] each disabled student's particular limitations and analyz[ed] whether and how it might accommodate that student in a way that would allow the student to complete the school's program without lowering academic standards." *Id.* at 826. The court declined to defer to the University of California's decision to dismiss a student because "the record contain[ed] facts from which a reasonable jury could conclude that the school made th[at] decision[] for arbitrary reasons unrelated to its academic standards." *Id.* In contrast, the record shows Palmer carefully considered whether it could accommodate Cannon's disability with a sighted assistant to look at X-rays. Palmer ultimately and

reasonably concluded it could not. No reasonable fact finder could conclude Palmer's decision was unrelated to academic standards.

In *Wynne I*, the Court of Appeals for the First Circuit set forth the appropriate analysis "to assess whether an academic institution adequately has explored the availability of reasonable accommodations for a handicapped individual." 932 F.2d at 26.

> If the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation.

*Id.* (noting "[i]n most cases, we believe that, as in the qualified immunity context, the issue of whether the facts alleged by a university support its claim that it has met its duty of reasonable accommodation will be a " 'purely legal one' " (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9, 105 S. Ct. 2806, 2816 n.9, 86 L. Ed. 2d 411, 426 n.9 (1985))). The student in *Wynne I* asked Tufts University School of Medicine to accommodate his disability by using a different testing method than multiple choice to evaluate his progress. *Id.* at 22. The court concluded the evidence was insufficient to grant summary judgment in favor of Tufts because the record did not demonstrate the school considered possible alternatives or discussed the unique qualities of multiple choice examinations. *Id.* at 28. The court therefore remanded the case for further fact-finding. *Id.*

Following remand, Tufts provided additional evidence explaining why " 'the multiple choice format provides the fairest way to test the students' mastery of the subject matter of biochemistry.' " *Wynne v.*

*Tufts Univ. Sch. of Med.* (*Wynne II*), 976 F.2d 791, 794 (1st Cir. 1992). With the additional evidence, the district court concluded Tufts met the standard elucidated in *Wynne I* and entered summary judgment in favor of Tufts. *Wynne II*, 976 F.2d at 793. The student again appealed to the First Circuit. *See id.* The *Wynne II* court acknowledged that "Tufts' explanations, though plausible, are not necessarily ironclad." *Id.* at 795. But, the court emphasized "the point is not whether a medical school is 'right' or 'wrong' in making program-related decisions." *Id.* Rather, "[t]he point is that Tufts, after undertaking a diligent assessment of the available options," decided "no further accommodation could be made without imposing an undue (and injurious) hardship on the academic program." *Id.* The First Circuit therefore affirmed summary judgment for Tufts, stating "the undisputed facts contained in the expanded record, *when considered in the deferential light that academic decisionmaking deserves*, meet the required standard." *Id.* at 796 (emphasis added) (citation omitted). Likewise, Palmer has provided compelling explanations why accommodating Cannon's disability with a sighted assistant to look at X-rays for him would fundamentally alter the chiropractic program. We owe deference to Palmer's explanations.

In order to accommodate Cannon, Palmer would have had to lower its academic standards—something the law does not require. *See Wong*, 192 F.3d at 826 (noting an institution is responsible for "carefully considering each disabled student's particular limitations and analyzing whether and how it might accommodate that student in a way that would allow the student to complete the school's program *without lowering academic standards*" (emphasis added)); *Wynne II*, 976 F.2d at 795 (deferring to Tufts' conclusion that accommodating the student "would require substantial program alterations, result in lowering

academic standards, and devalue Tufts' end product—highly trained physicians carrying the prized credential of a Tufts degree"). As a professor explained, the Palmer radiology curriculum has three primary goals: to teach students to (1) produce diagnostic-quality X-rays, (2) interpret and glean clinical information off of X-ray film, and (3) apply the information in a clinical sense for case management. The district court summarized how Cannon's proposed accommodation—a sighted assistant to describe X-rays to him—would work: "Cannon asks a series of questions to the assistant, gradually posing those questions more and more specifically as needed in order to obtain the information necessary for him to visualize the displayed image or text." A professor explained why this accommodation would compromise Palmer's academic requirements:

> I haven't been able to determine how a sighted assistant could give information to the blind student that would not compromise [the student's] independent judgment of those films. [For the student to ask] the question, is the film too dark or is the film too light, immediately [the reader's] answer to that is a judgment and it compromises the student's ability to independently make that judgment themselves.
>
> . . . .
>
> And so if a student is told . . . the film is too dark, somebody has already made the judgment for them . . . . If they are told the patient is not aligned or they ask the question is the patient aligned and the answer is no, then that, once again, leverages their independent judgment as to whether or not the film needs to be repeated and/or what needs to be done to make the film better.

Essentially, a sighted assistant would have to interpret the X-rays and then relay that interpretation to Cannon; Cannon would not be interpreting the X-rays himself. In light of these realities, Palmer determined that Cannon would be unable to attain the goals of the

radiology curriculum. Palmer has demonstrated that a sighted assistant is not a reasonable accommodation.

It is not as if Palmer adopted the technical standards lightly or did not consider Cannon's arguments for why he should be admitted. Palmer has carefully considered the skills necessary to become a chiropractor and determined that the ability to read X-rays is integral. As one Palmer professor explained, the technical standards Palmer adopted are "clearly based from an educational perspective on individuals that we have interacted with in the curriculum and what has worked and what has not worked." Palmer adopted its technical standards in order to comply with the Council on Chiropractic Education's national accreditation standards, further supporting the school's conclusion that vision is necessary to earn a chiropractic degree. *See Case W. Reserve Univ.*, 666 N.E.2d at 1379–80, 1385–86 (deferring to Case Western's application of technical standards promulgated by the AAMC). As noted, Palmer met with Cannon multiple times, met with Iowa Department of the Blind representatives, and expressed a willingness to continue the dialogue. *Cf. Wong*, 192 F.3d at 819, 821 (reversing summary judgment in favor of university when "Dean Lewis failed to discuss Wong's proposal with any of the professionals who had worked with Wong to pinpoint his disability and help him develop skills to cope with it."). Yet, Palmer remained convinced that the program modifications necessary to accommodate Cannon would fundamentally alter its program.

I do not find it legally significant that Palmer modifies its course requirements and grants certain waivers for blind students enrolled at its California campus. California law mandates these accommodations by statute. *See* Cal. Bus. & Prof. Code § 1000–8 (West, Westlaw through ch.

25 of 2014 Reg. Sess., Res. ch. 1 of 2013–2014 Ex. Sess., and all propositions on the 6/3/2014 ballot) (stating "[n]o blind person shall be" denied (1) admission to a chiropractic school, (2) the right to take a chiropractic exam, (3) a chiropractic diploma, (4) admission into an examination for a state chiropractic license, or (5) a chiropractic license "on the ground that he is blind"). That California statute does not apply extraterritorially in Iowa. Unlike California, the Iowa legislature has not enacted a statute requiring Palmer to waive requirements for blind persons. Simply because another state imposes such accommodations on an institution does not mean that those accommodations are not fundamental alterations of Palmer's Iowa academic program. Palmer has provided ample evidence supporting why Cannon's proposed accommodation would fundamentally alter its program, and our inquiry should end there.

Nor am I convinced otherwise by the fact that blind individuals have previously graduated from Palmer. These individuals attended Palmer many years ago. *See Case W. Reserve Univ.*, 666 N.E.2d at 1385 (discounting testimony of blind doctor who graduated from Case Western because the doctor "attended [the university] twenty years ago, under entirely different circumstances than proposed today"). The academic standards of the profession have changed since those individuals graduated, and uniform technical standards have been adopted. Under the majority's analysis, a school could never strengthen its program requirements for legitimate reasons if the result excludes a disabled person.

The commission erred, as a matter of law, by failing to defer to Palmer's decision that Cannon could not satisfy its academic standards. See *Wynne I,* 932 F.2d at 26 (explaining institution must seek means of

reasonably accommodating individual and "[i]f the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means . . . the court could rule as a matter of law that the institution had met its duty"). Palmer fulfilled its obligation of inquiry before denying Cannon's requested accommodation of a sighted assistant to read X-rays. Palmer has reasonably concluded that the ability to personally see and interpret X-rays is essential in order to successfully diagnose and treat patients, without relying on the observations of an untrained sighted assistant. Considering the safety of future patients, there is nothing unreasonable about this requirement. The majority has not "struck a balance" between the statutory rights ensuring those with disabilities "meaningful access" to the benefits offered by educational institutions and "the legitimate interests" of those institutions in preserving the integrity of their programs. *See Alexander v. Choate*, 469 U.S. 287, 300–01, 105 S. Ct. 712, 720, 83 L. Ed. 2d 661, 671–72 (1985). Rather, the majority and the commission have run roughshod over Palmer's legitimate interests and the integrity of Palmer's chiropractic program. Accordingly, I respectfully dissent.

Mansfield, J., joins this dissent.